No. 26,728.

STATE OF KANSAS, *Appellee*, v. MARTIN S. SNOW, *Appellant*.

SYLLABUS BY THE COURT.

1. HOMICIDE — *Instructions—Self-defense*. Proceedings resulting in conviction of murder in first degree considered, and held that the instructions correctly and fairly stated the law of self-defense as applicable to the facts.

2. SAME—*Instructions—Evidence of Threats*. And further, under the circumstances narrated in the opinion, it was not error for the court to instruct the jury that "if you find and believe from the evidence that prior to the shooting, the deceased had made threats against the defendant, you may consider such threats and the reputation of the deceased, together with all the other evidence, in determining who was the aggressor."

3. SAME—*Instructions Generally*. Other objections to the instructions considered and held not to be of substantial merit.

4. JURIES—*Competency—Formation and Expression of Opinion*. The proceedings considered, and *held*, the challenge to a certain juror was properly overruled.

5. HOMICIDE—*Trial Generally*. Various alleged errors considered and held not to require a reversal.

Appeal from Linn district court; EDWARD C. GATES, judge. Opinion filed July 10, 1926. Affirmed.

*John A. Hall*, of Pleasanton, for the appellant.

*Charles B. Griffith*, attorney-general, *H. D. Reeve*, county attorney, and *Harry W. Fisher*, of Fort Scott, for the appellee.

---

Homicide, 30 C. J. pp. 173 n. 90, 256 n. 26, 264 n. 42, 372 n. 40, 387 n. 33; 13 R. C. L. 812. Juries, 35 C. J. p. 349 n. 80.

State v. Snow.

.The opinion of the court was delivered by

HOPKINS, J.:    The defendant was convicted of. murder in the first degree, and appeals.

About ten o'clock on the morning of March 31, 1925, the defendant shot Arthur Seals with a shotgun on a public highway two miles west of the north part of Pleasanton; according to the defendant's claim, in self-defense.   Seals died in a hospital at Fort Scott about 1:45 p. m. the same day.   The defendant and a brother, N. D. Snow, lived with Mrs. Lena Snow, their sister-in-law, in a house near the scene of the tragedy.   Mrs. Snow is the widow of Ira Snow, who died in 1919.   The Snows owned and controlled about 800 acres of land in that vicinity.   Seals lived with his family on an adjoining farm to the north and across a public road which runs east and west. The shooting occurred on a highway which intersects with the east-and-west road and which runs north and south between two tracts of land owned by Mrs. Snow; one tract of fifty acres on the west, on which was located the house in which the Snows lived; the other tract, a forty-acre pasture, on the east side of the north-and-south road.´ Along the south side of the pasture land, running in an easterly direction, is a small creek.   The south part of the pasture land is also covered with timber.   On either side of the north-and-south road was a wire fence, and along the east side were scattering hedge trees of what had once been a hedge fence.   These trees were from six to ten feet on the inside of the fence which marks the boundary of the east side of the road.   Mrs. Snow's house was located on the side of a hill, a distance of about 750 feet west of the place of the crime.   At the time of the tragedy the defendant was sixty-three years old and had resided in that vicinity all his life. Arthur Seals had moved with his family to the farm north in the fall of 1922.   The defendant had been married in his early life, but had been single for some thirty years.   He suffered several strokes of apoplexy, the first, a slight one, in 1920.   He was afflicted by these strokes, as are most persons who have so suffered.   He could not talk as ordinary persons, was unable to run or to walk fast, and had not been able to do ordinary farm work for a number of years. Seals kept hound dogs, which caused ill feeling between the families. The Snows had posted signs prohibiting hunting on their ground. While the evidence did not show that Arthur Seals actually hunted

on the land of the Snows, it showed that when he went back and forth on the roads that the dogs ran over the Snow land, hunted through the pasture, and committed annoying depredations about the Snow farm.

The morning of the tragedy Mrs. Snow discovered the dogs eating eggs from a nest in a pile of cornstalks and fodder near her barn. She told the defendant, who took a 12-gauge shotgun and some shells, went out and shot at the dogs near the barn. The dogs were frightened away and went in a southeasterly direction towards the creek and timber on the south part of Mrs. Snow's pasture land. The defendant followed them in that direction down into the pasture, where he again shot one of the dogs, which howled and ran away. The defendant then started on his return toward the house. Arthur Seals on the morning of the tragedy was plowing for corn in the field immediately across the road north of this pasture land. At the time the defendant shot the dogs near the creek, Seals was near the south end of the field and heard the shot. His father, L. H. Seals, was near by. When Arthur heard the dogs howl he left his plow and went to the fence alongside of the field and called loudly several times, in substance, "What is going on down there?" He then asked his father to hold his team, stating that he was going down to see what was going on. He went west along the east-and-west road to the intersection of the north-and-south road and then south, where he met the defendant. There was a dispute in the evidence as to just where the tragedy occurred on the north-and-south road; the defendant claimed it was about 495 feet south of the intersection of the two roads; the state that it was about 248 feet south of the intersection. The tragedy was witnessed by Mrs. Snow and by the elder Seals, Mrs. Snow being between 750 and 800 feet and Seals between 416 and 617 feet distant therefrom—depending on the location, which was in doubt because of the dispute—the defendant contending Mrs. Snow had a better view than the elder Seals. The state contends that the crime was just as great if Martin Snow killed Arthur Seals two hundred feet farther south in the public highway as at the spot identified in the state's evidence; that the opportunity for the elder Seals to have seen, even at the farthest point fixed by the defense, was much better than the opportunity for seeing by Mrs. Snow. The fact that the deceased was standing at or near the center of the public highway, and that the defendant

State v. Snow.

had just crawled through the fence on the east side of the public highway almost opposite him, was undisputed. The fences were about the same in both locations; that after all it was a disputed question of fact resolved by the jury in favor of the state. Mrs. Snow testified that—

"After Martin had got a short distance coming back, I saw Arthur Seals coming down the road toward the south. . . . During that time Martin Snow was coming back along the road home. Arthur Seals was walking fast and Martin Snow was walking slowly. When Arthur Seals reached this point furtherest south, Martin Snow was on over east in the pasture. . . . After Seals reached the southernmost point, he walked back along this road and about then Martin Snow changed his direction to a more northerly direction." They "were about even and Arthur Seals was pretty nearly west of Martin Snow. . . . Martin Snow stopped for some time and Arthur Seals continued to walk on down the road north. He was walking slowly and was looking back and was talking in a loud voice. After he had passed this gap in the fence going north, then Martin came across to the fence and there stopped and crawled through the fence coming west into the road, and after he crawled through the fence, took a few steps out into the road from the fence in a northwest direction, which was in the direction of the gap in the fence on the west side of the road and in the direction of the house. . . . Arthur Seals was out in the road about a hundred feet north of that place. . . . When Martin Snow crawled through the fence and took two or three steps out in the road towards the gap on the west side of the road, Arthur Seals turned around and went back toward Martin Snow. . . . He went faster than he did when he was going north. . . . I heard some loud talking, but I could not hear Martin Snow's voice until after he had got through the fence and Seals had walked part way back to him. Martin was pointing toward the barn in a westerly direction with his left hand, and while he was pointing toward the barn I heard him say the word 'eggs.' I could not distinguish any other word that Martin Snow said. I could not distinguish any of the words that Seals said, but I could hear his voice. When Martin Snow was standing there two or three steps out in the road from where he had crawled through the fence Arthur Seals had walked a ways back toward Martin Snow at the time Martin Snow was pointing toward the barn, and then Arthur Seals ran his hand into his pocket and started in a fast gait toward Martin Snow. When Arthur Seals first ran his hand into his pocket and started in a fast gait towards Martin Snow, I would estimate that Arthur Seals was forty-five or fifty feet away from Martin Snow. After Arthur Seals did that, then I saw Martin Snow raise his gun and after a short space of time he fired. When Martin raised his gun he stepped back two or three steps and that put him right up against or nearly against the fence, and Arthur Seals was rushing toward him, and Arthur Seals was within ten or twelve feet of Martin when Martin fired. There were two explosions from the gun. . . . The best of my judgment is that the length of time between the shots was one second. It seemed that the first shot knocked Seals around toward the left, and at the time of the second shot he was just turned slightly around with his

elbow slightly thrown out. I did not hear anything else just at that time. After the shots were fired, Seals stood there just a little while and then sauntered away to the north. He probably stood there two or three seconds before he started north, at a walking gait. About eighty or eighty-five feet north of where he was shot I heard him holloa just as if to attract attention, and he said nothing, but continued to walk along. After he had walked about two rods and a half he holloaed, but I could not distinguish what he said. One time it sounded like he said 'Pa.' After Arthur Scals had started back north and had gone a short distance, Martin Snow crossed the road to the gap in the fence and came on up the path to the house."

L. H. Seals testified that—

"When Martin Snow got up to the fence he walked right up to the fence and crawled through the wire and made a step or two or maybe three toward Arthur to the west. Arthur Seals was standing just west of Snow. After Martin Snow took the step or two out in the road, he pulled up his gun and shot Arthur. Then Martin Snow lowered his gun and Arthur made a little start away from there and he raised up his gun and shot him again. When Snow fired the first shot, Arthur was facing him just a little sideways. After the first shot Arthur started to run north. . . . He had only got started when the second shot was fired. When the second shot was fired Arthur was running and holloaing. I met Arthur at the hedge there, them hedge trees on Fisher's place, at the north side of the intersection of the north-and-south road with the east-and-west road. One side of Arthur's lower jaw was torn away."

The evidence of the doctors was substantially that the whole left side of the deceased's lower jaw up nearly as high as the ear was completely shot away, also a greater part of the neck nearly down to the collar bone, also a wound in the back side of his upper right arm. The one in the face and neck was a mortal wound; that there were probably forty or fifty shots in the right arm.

The defendant complains of the court's instructions with reference to self-defense, especially instruction 14, which reads:

"The defendant, in connection with his plea of not guilty, has also interposed the plea of self-defense. The court instructs the jury that the right to defend one's self against danger, not of his own making, is a right which the law not only concedes but guarantees to all men. The defendant may therefore have shot the said Arthur Seals and still be innocent of any offense against the law. If at the time he shot the said Arthur Seals he had reasonable cause to apprehend on the part of Arthur Seals a design to do him, defendant, some great personal injury and there was reasonable cause for him to apprehend the immediate danger of such design being accomplished, and to avoid such apprehended danger he shot, and at the time he did so he had reasonable cause to believe and did believe it necessary for him to use the shotgun in the way he did to protect himself from such apprehended danger, then and in that case the shooting was not felonious, but was justifiable, and you should acquit him on the ground of necessary self-defense. It is not nec-

essary to this defense, that the danger should have been actual or real or that the danger should have been impending and immediately about to fall. All that is necessary is that the defendant had reasonable cause to believe and did believe these facts. In the exercise of his judgment he must act rationally, but he is justified in acting upon the facts as they appeared to him, and is not to be judged by the facts as they actually were; but before you acquit on the ground of self-defense you ought to believe that the defendant's cause of apprehension was reasonable, and in this connection it is your duty and you should consider whatever threats were made, if you find any were made, by Arthur Seals of personal violence to the defendant, and which threats were communicated to the defendant, if you so find they were communicated to him. Whether the facts constituting such reasonable cause have been established by the evidence you are to determine, and unless the facts constituting such reasonable cause have been established by the evidence in the case you cannot acquit on the ground of self-defense, even though you believe that the defendant really thought that he was in danger. But, on the other hand, you are instructed that the law does not permit a person to voluntarily seek or invite a combat or put himself in the way of being assaulted, in order, when hard pressed, he may have a pretext to take the life of his assailant. The right of self-defense does not imply the right to attack, and it will not avail in any case where the difficulty is sought for or induced by the party by any willful act of his own, or where he voluntarily and of his own free will enters into it, no matter how imminent his peril may become during the progress of the affray. The necessity, being of his own creation, shall not operate to excuse him. Nor is any one justified in using any more force than is necessary to get rid of his assailant, but if he does not bring on the difficulty or provoke it or voluntarily engage in it, he is not bound to flee to avoid it, but may resist with adequate and necessary force until he is safe.

"If you find and believe from the evidence that prior to the shooting the deceased had made threats against the defendant, you may consider such threats and the reputation of the deceased, together with all the other evidence, in determining who was the aggressor."

The defendant contends that the instructions should have read:

"Nor is anyone justified in using more force than reasonably appears to him to be necessary to get rid of his assailant."

It will be noted that the court used substantially the words contended for by the defendant. The instructions contained this statement:

"In the exercise of his judgment he must act rationally, but he is justified in acting upon the facts as they appeared to him, and is not to be judged by the facts as they actually were."

The language used by the trial court was in accordance with what was stated by this court in the opinion, *State v. Keehn,* 85 Kan. 765, 792, 118 Pac. 851. The law of self-defense was there well treated. It was said:

"The law of self-defense cannot be presented, illustrated and applied all at once in a single statement to the jury. There must be arrangement and sequence in the presentation of declaration and limitation, proposition and qualification, statement and supplementary statement. It is not necessary that such a presentation conform to the rules of rhetoric or that any particular order be followed. It is sufficient if all the necessary statements clearly appear, and when they do so appear they will be read together for the true scope and sense of each." (Syl. ¶ 6. See, also, *State v. Schwenk,* 101 Kan. 408, 167 Pac. 743.)

We are of opinion the instruction in question correctly and fairly stated the law applicable to the facts.

The defendant complains of that part of the instruction which states:

"If you find and believe from the evidence that prior to the shooting the deceased had made threats against the defendant, you may consider such threats and the reputation of the deceased, together with all the other evidence in determining who was the aggressor."

He argues that it was prejudicial and erroneous to instruct the jury to consider the reputation of the deceased.

"In homicide cases the character of the *deceased,* as a general rule, is not in issue, and in such cases evidence of his general reputation for having been a dangerous and violent man is excluded; but when the evidence tends to show that the accused committed the homicide in *self-defense,* under a reasonable apprehension of danger, or when the nature of the killing is in doubt and the evidence wholly circumstantial, such evidence is held admissible." (Hughes on Evidence, p. 41.)

"If accused undertakes to justify the homicide on the ground of threats made by deceased it is held that the state may prove that the general character of deceased was that of an inoffensive man, and one not reasonably to be expected to execute the threats." (30 C. J. 173.)

"Where the defense is self-defense, the character of the deceased, especially if known to the defendant, is material and may be shown by the state." (*Dukes v. State,* 11 Ind. 557.)

Where defendant, on trial for murder, testifies "that the deceased assaulted him, and that he apprehended great injury from the assault," the peaceable character of deceased may be shown in rebuttal. (*Fields v. The State,* 134 Ind. 46. See, also, *State v. Truskett,* 85 Kan. 804, 820, 118 Pac. 1047, and *Phipps v. The State,* 34 Tex. C. R. 560.)

Under the circumstances narrated, the instruction was not improper. Numerous other objections to the instructions have been considered. We are of opinion that they are without substantial merit, and that the instructions as given fairly cover the issues in the case.

Complaint is made of the admission of the dying declaration of the deceased, the question being whether he realized that he was in a dying condition. We think from all the circumstances he could well know from his own physical condition that he could not live. His entire left jaw had been shot away, his neck was torn and lacerated, and he was bleeding profusely. The fact that the local doctor at Pleasanton, to whom he was taken, immediately put him on the train and rushed him to a hospital may well have impressed him with the seriousness of his condition. He told his wife at parting with her at Pleasanton that he would never live. The doctors told him he should make a statement, and called the county attorneys of both Linn county and Bourbon county in reference to the matter. One of the doctors told him at that time that he would not get well. When he was told a statement should be taken he told the doctors that he would not get well, or he knew he would not get well. The statement was taken from him at 12:10 p. m. and he was dead at 1:45 p. m. The declaration, taken in form of question and answer, reads:

"Who shot you? Mart Snow. Did you assault him in any way? No, sir. How many times did he shoot at you? Twice. Did you threaten to kill him? No, sir. Did you put your hand in your pocket to get your knife? No, sir. I didn't have any knife. Did not cuss him."

"It is immaterial how or by what means deceased became conscious that he was dying. . . . And even the expression of hope or of a belief that decedent would recover by a physician does not affect the admissibility of the declaration if the declarant nevertheless believed that he was about to die, and was without expectation or hope of recovery." (30 C. J. 256.)

In our opinion it was not improper to admit the declaration.

The defendant complains that the court overruled his challenge of the juror J. T. Myers. It appears that the juror first indicated that he had formed or expressed an opinion concerning material issues in the case. On full examination by the court, however, he was determined to be qualified. In our opinion the court committed no error in overruling the challenge. (*State v. Stewart,* 85 Kan. 404, 116 Pac. 489; *State v. Pearce,* 87 Kan. 457, 124 Pac. 814; *State v. Mullins,* 95 Kan. 280, 147 Pac. 828; *State v. Smith,* 103 Kan. 148, 174 Pac. 551; *State v. Henson,* 105 Kan. 581, 185 Pac. 1059; *State v. Elftman,* 116 Kan. 214, 226 Pac. 795.)

Other complaints have been considered, but we find no error which would warrant a reversal.

The judgment is affirmed.