No. 27,185.

CORA SEALS, *Appellee*, v. MARTIN SNOW, Revived in the Name of N. D. SNOW, Administrator, *Appellant*.

### SYLLABUS BY THE COURT.

1. INSANE PERSONS—*Liability for Torts.* An insane person who shoots and kills another is civilly liable in damages to those injured by his tort.

2. DEATH — *Damages for Causing — Defenses—Self-defense—Instructions.* Instructions of the court given as to self-defense and the refusal of requested instructions as to the comparative physical and mental condition of the defendant and the person shot by him, and also as to the defendant having been induced to shoot the deceased by reason of threats or other acts of the person killed, examined and held to be without material error.

3. JURIES—*Formation of Opinion—Character of Opinion.* The first answer of a prospective juror that he had an opinion as to the controversy to be tried is not conclusive as to disqualification, and if on further inquiry he states that he has no fixed opinion and can decide the case on the evidence and the law regardless of what he had heard and read, the finding of the court that he is qualified is not regarded to be erroneous.

4. DEATH—*Trial Generally.* Other objections examined and held to be without merit.

Appeal from Linn district court; EDWARD C. GATES, judge. Opinion filed March 12, 1927. Affirmed.

*John A. Hall,* of Pleasanton, for the appellant.
*Harry W. Fisher,* of Fort Scott, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: Cora Seals brought this action against Martin Snow to recover damages for shooting and killing her husband, Arthur Seals. She alleged that he left surviving him the plaintiff and four minor children, the heirs of the deceased, and that the action was brought for the benefit of the children and heirs.

In the answer of defendant he alleged that prior to the shooting of Arthur Seals he had suffered several strokes of paralysis which rendered him incapable of personal defense of himself; that Arthur Seals was a strong, able-bodied man about thirty years of age; that he knew of the feeble condition of the defendant, and that at the time of the tragedy Seals had threatened defendant and was in the

Appeal and Error, 4 C. J. pp. 811 n. 55, 1048 n. 76. Death, 17 C. J. p. 1313 n. 65. Insane Persons, 32 C. J. p. 749 n. 94; 26 L. R. A. 153; 42 L. R. A. n. s. 83; 14 R. C. L. 576. Juries, 35 C. J. pp. 349 n. 80, 350 n. 85, 405 n. 33; 35 L. R. A. n. s. 988; 16 R. C. L. 266. Trial, 38 Cyc. p. 1711 n. 19.

Seals v. Snow.

act of attacking and terrorizing him, so that defendant believed that Seals was about to commit great bodily injury upon him.

It was further alleged that the aggression of Seals caused Martin Snow to become greatly excited, and caused him to believe he was in great fear and terror, and had purposely caused Snow to shoot at Seals with a shotgun which defendant had in his possession. The reply was a general denial. The jury returned a verdict in favor of the plaintiff for $10,000. With the verdict were the following special findings:

"1. Did Martin Snow at the time he shot Arthur Seals have reasonable cause to apprehend that Arthur Seals was about to do him some great personal injury? A. No.

"2. Did Martin Snow kill Arthur Seals in self-defense? A. No.

"3. Who was the aggressor at the time Arthur Seals was shot by Martin Snow? A. Martin Snow.

"4. Was Martin Snow insane when he shot Arthur Seals? A. Yes.

"5. If you answer the last question in the affirmative, was Martin Snow at the time he shot Arthur Seals able to distinguish right from wrong? A. No."

Several special questions requested by the defendant were not submitted to the jury. Among them were the questions:

"Q. Was Martin Snow physically able to defend himself against the attack of Arthur Seals at the time of the tragedy?

"Q. Did Arthur Seals know, or should he reasonably have known, at the time of the tragedy that Martin Snow was physically unable to defend himself?"

The facts pertaining to the killing of Arthur Seals were reviewed in the criminal case of *State v. Snow*, 121 Kan. 436, 247 Pac. 437. In this appeal a number of rulings are assigned for review.

Complaint is made of the overruling of objections to the prospective juror, I. J. Adams. On first inquiry he stated that he had an opinion as to the controversy which it would take evidence from one side or the other to change. In response to another question he stated that it was a fixed opinion. The court then questioned him, and in answer he stated that he did not have a positive opinion, but had one formed from what he had heard. The court then said to him there is a difference between an impression and an opinion, and he then stated the one he had would not be a fixed opinion. "If I sit on this jury I would expect to decide it from the law and the evidence produced." The court said, "Regardless of anything you read, heard or seen?" Answer. "Yes." And the court said, "You could do that, and lay all that aside?" A. "I could." The challenge was

overruled, and the defendant exercised all of his peremptory challenges. The mere statement of the juror that he held an opinion as to the controversy is not conclusive of disqualification where as here a further inquiry developed that he was without prejudice in the case, was free to consider the evidence and decide the questions involved in the facts presented at the trial under the instructions of the court on the law. Whether he had a positive opinion or a mere impression was a question of fact for the trial court, and unless it is clear that the juror was disqualified the finding of the court cannot be set aside. Under the authorities, only a few of which we need to cite, the ruling of the court cannot be held to be erroneous. (*State v. Kornstett,* 62 Kan. 221, 61 Pac. 805; *State v. Smith,* 74 Kan. 383, 85 Pac. 1020, 89 Pac. 21; *State v. Stewart,* 85 Kan. 404, 116 Pac. 489; *State v. Van Wormer,* 103 Kan. 309, 173 Pac. 1076, 180 Pac. 450.)

The defendant challenges the doctrine generally sustained by the courts that an insane person is liable to make compensation for his torts. It is conceded that the great weight of authority is that an insane person is civilly liable for his torts. This liability has been based on a number of grounds, one that where one of two innocent persons must suffer a loss, it should be borne by the one who occasioned it. Another, that public policy requires the enforcement of such liability in order that relatives of the insane person shall be led to restrain him and that tort-feasors shall not simulate or pretend insanity to defend their wrongful acts causing damage to others, and that if he was not liable there would be no redress for injuries, and we might have the anomaly of an insane person having abundant wealth depriving another of his rights without compensation. In 1 Cooley on Torts, 3d ed., 170, 171, the learned author says:

"A wrong is an invasion of right, to the damage of the party who suffers it. It consists in the injury done, and not commonly in the purpose or mental or physical capacity of the person or agent doing it. It may or may not have been done with bad motive. The question of motive is usually a question of aggravation only. Therefore, the law, in giving redress, has in view the case of the party injured, and the extent of his injury, and makes what he suffers the measure of compensation. . . . There is consequently no anomaly in compelling one who is not chargeable with wrong intent to make compensation for an injury committed by him, for, as is said in an early case, 'the reason is because he that is damaged ought to be recompensed.'"

At page 172 he says:

"Undoubtedly, there is some appearance of hardship, even of injustice, in compelling one to respond for that which, for want of the control of reason, he

was unable to avoid; that it is imposing upon a person already visited with the inexpressible calamity of mental obscurity an obligation to observe the same care and precaution respecting the rights of others that the law demands of one in the full possession of his faculties. But the question of liability in these cases, as well as in others, is a question of policy; and it is to be disposed of as would be the question whether the incompetent person should be supported at the expense of the public, or of his neighbors, or at the expense of his own estate. If his mental disorder makes him dependent, and at the same time prompts him to commit injuries, there seems to be no greater reason for imposing upon the neighbors or the public one set of these consequences, rather than the other; no more propriety or justice in making others bear the losses resulting from his unreasoning fury, when it is spent upon them or their property, than there would be in calling upon them to pay the expense of his confinement in an asylum, when his own estate is ample for the purpose."

The authorities upholding the doctrine are well-nigh unanimous, and so firmly established by the courts that we see no good reason to depart from or vary the rule. A leading case is *Williams v. Hays,* 143 N. Y. 442, and also 32 C. J. 749; 14 R. C. L. 596; Buswell on Insanity, § 355; Shearman and Redfield on Negligence, 6th ed., § 121, and the numerous cases cited in these authorities.

Some of the requested instructions, the refusal of which is assigned as error, were intended to bring to the consideration of the jury the comparative physical condition of Snow and Seals. It is said that Snow was sixty years old, had been weakened by paralytic strokes, while Seals was an able-bodied man thirty years of age, and that Snow's realization of his incapacity to defend himself was a proper matter for the consideration of the jury in order to determine whether he reasonably believed he was in imminent danger of great bodily harm at the hands of Seals when he killed him. There was testimony to the effect that dogs belonging to Seals had been running over the Lena Snow farm where the defendant was staying, that they were interfering with chickens, eating eggs and food provided for the Snow chickens, that there had been quarrels between the Snows and Seals and that the defendant had shot at the marauding dogs. On the morning that defendant killed Seals, the defendant had shot at the dogs and one of them had howled as if he had been hurt. Seals, who was at work on the adjoining farm, heard the shots and the howling of the dogs, went to the road near where the shooting had occurred, and when he came near to the place of the tragedy he saw Snow coming to and along the road and approaching Seals. When within a short distance of Seals—the dis-

tance and relative positions of the parties as well as the language used by each is in dispute—but it appears that when they were about twelve feet apart, the defendant raised his gun and fired at Seals. The first carried away the left side of his jaw and neck from the ear to the collar bone, when Seals turned about and made an outcry, and within about a second another shot was fired which struck the upper and back part of Seal's right arm. The first shot caused a fatal wound, and Seals died shortly afterwards. The instructions refused, which related to the comparative strength and physical ability of Seals and the defendant, were asked upon the theory that the defendant acted lawfully in self-defense. The instructions given on self-defense, while they did not particularize as to the size and strength of the two men, did cover fully the rules of law relating to self-defense as fully in fact as would have been required if the defendant had been on trial for murder. In part the jury were instructed that:

"The right to defend one's self against danger not of his own making is a right which the law not only concedes but guarantees to all men. The defendant may, therefore, have shot the said Arthur Seals and still be innocent of any offense against the law. If, at the time he shot the said Arthur Seals, he had reasonable cause to apprehend on the part of Arthur Seals a design to do him, the defendant, some great personal injury and there was reasonable cause for him to apprehend the immediate danger of such design being accomplished, and to avoid the apprehended danger, he shot, and at the time he did so he had reasonable cause to believe, and did believe, it necessary for him to use the shotgun in the way he did to protect himself from such apprehended danger, then and in that case the shooting was not wrongful or felonious but was justifiable, and the defendant would not be liable for injuries resulting to plaintiff therefor. It is not necessary to this defense that the danger should have been actual or real, or that the danger should have been impending and immediately about to fall. All that is necessary, is that the defendant had reasonable cause to believe and did believe these facts."

As to the matter of threats the court told the jury that:

"It is your duty and you should consider whatever threats were made, if you find any were made, by Arthur Seals of personal violence to the defendant, and which threats were communicated to the defendant, if you find they were communicated to him."

After statements to the effect that the right of self-defense did not imply the right to attack, the court added:

"If you find from the evidence that prior to the shooting that Arthur Seals, the deceased, had made threats against the defendant, you may consider such threats, together with all of the other evidence, in determining who was the aggressor."

Seals v. Snow.

It thus appears that everything in the evidence relating to self-defense, including the superior strength of Seals, which might cause defendant to apprehend immediate danger of personal injury, were submitted for the consideration of the jury, and the jury was advised that not only the evidence of threats that Seals may have made, but also all the other evidence in the case should be considered. The omission of special reference to the comparative physical condition and strength of the men is not deemed to be a ground for reversal. Two other instructions requested and refused were to the effect that if defendant was in a feeble mental condition and Seals knew of such condition, such facts should be taken into consideration, whether defendant had reason to believe he was in imminent danger of personal injury at the hands of Seals and whether or not he acted lawfully in his self-defense. It appears that the court after telling the jury that if defendant at the time of the shooting was insane or mentally deficient, that of itself would not constitute a defense, but he added:

"I further instruct you that a man who is insane or incapable of correctly judging between right and wrong, has the same full right to act in self-defense as a normal person. If you find from the preponderance of the evidence that Martin Snow was justified in killing said Arthur Seals, in self-defense as hereinbefore defined, then your verdict should be for the defendant."

Other requests were made relating to the mental condition of the defendant and that if he was incapable of judging between right and wrong, and Seals with knowledge of his mental condition provoked or induced him to fire the shots, he should be acquitted. These requests so far as they were applicable were fairly covered in the general charge given.

Other objections to the instructions have been examined and are not deemed to be grounds for disturbing the verdict, nor do we find any error in the failure to submit other special questions.

We find no error in the admission of evidence, and we think that the evidence produced is sufficient to uphold the verdict and judgment.

The judgment is affirmed.