## DOROTHY B. POLMATIER, EXECUTRIX (ESTATE OF ARTHUR R. POLMATIER) *v.* NORMAN RUSS
### (12926)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and HULL, Js.

Argued December 2, 1987—decision released February 9, 1988

*Marcia A. Winn,* with whom, on the brief, were *Cindy A. O'Connor, Cheryl Sladicki* and *Robin A. Forshaw,* legal interns, for the appellant (defendant).

*Thomas P. Heslin,* with whom, on the brief, were *Richard P. Lawlor* and *Thomas J. Egan,* for the appellee (plaintiff).

GLASS, J. The principal issue on this appeal is whether an insane person is liable for an intentional tort. The plaintiff, Dorothy Polmatier, executrix of the estate of her deceased husband, Arthur R. Polmatier, brought this action against the defendant, Norman Russ, seeking to recover damages for wrongful death. The state trial referee, exercising the power of the Superior Court, rendered judgment for the plaintiff. The defendant has appealed from that judgment. We find no error.

The trial court's memorandum of decision and the record reveal the following undisputed facts. On the afternoon of November 20, 1976, the defendant and his two month old daughter visited the home of Arthur Polmatier, his father-in-law. Polmatier lived in East Windsor with his wife, Dorothy, the plaintiff, and their eleven year old son, Robert. During the early evening Robert noticed a disturbance in the living room where he saw the defendant astride Polmatier on a couch beating him on the head with a beer bottle. Robert heard Polmatier exclaim, "Norm, you're killing me!" and ran to get help. Thereafter, the defendant went into Polmatier's bedroom where he took a box of 30-30 caliber ammunition from the bottom drawer of a dresser and went to his brother-in-law's bedroom where he took a 30-30 caliber Winchester rifle from the closet. He then returned to the living room and shot Polmatier twice, causing his death.

About five hours later, the defendant was found sitting on a stump in a wooded area approximately one half mile from the Polmatier home. The defendant was naked and his daughter was in his arms wrapped in his clothes, and was crying. Blood was found on his clothes, and he had with him the Winchester rifle, later determined to be the murder weapon.

The defendant was taken to a local hospital and was later transferred to Norwich Hospital. While in custody

he was confined in Norwich Hospital or the Whiting Forensic Institute. The defendant was charged with the crime of murder pursuant to General Statutes § 53a-54a (a),[1] but was found not guilty by reason of insanity pursuant to General Statutes § 53a-13.[2] Dr. Walter Borden, a psychiatrist, testified at both the criminal and this civil proceeding regarding the defendant's sanity. In the present civil case Borden testified that, at the time of the homicide, the defendant was suffering from a severe case of paranoid schizophrenia that involved delusions of persecution, grandeur, influence and reference, and also involved auditory hallucinations. He concluded that the defendant was legally insane and could not form a rational choice but that he could make a schizophrenic or crazy choice. He was not in a fugue state. The trial court found that at the time of the homicide the defendant was insane.

The substitute complaint for the wrongful death of Polmatier alleged in the first count that the death resulted from an assault, beating and shooting by the defendant, and included a second count for exemplary damages and a third count based on negligence. The defendant filed a substitute answer denying all material allegations of the plaintiff's substitute complaint and asserted three special defenses: (1) as to all counts, the defendant was non compos mentis at the time of the alleged assault and, therefore, not capable of forming the intent necessary for tort liability; (2) the third

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] "[General Statutes] Sec. 53a-13. LACK OF CAPACITY DUE TO MENTAL DISEASE OR DEFECT AS AFFIRMATIVE DEFENSE. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

count was barred by General Statutes § 52-584, the statute of limitations; and (3) as to all counts, the plaintiff or the plaintiff's decedent was comparatively or contributorily negligent. The trial court determined that the first and second special defenses were inapplicable to this case and that the third special defense had not been proven.

After a trial to the court, the court found for the plaintiff on the first count and awarded compensatory damages.[3] On appeal the defendant claims that the trial court erred in failing to apply the following two-pronged analysis to his claim: first, whether the defendant intended the act which produced the injury; and second, whether he intended the resulting injury. We find no error.

## I

Connecticut has never directly addressed the issue of whether an insane person is civilly liable for an intentional tort.[4] The majority of jurisdictions that have con-

---

[3] The trial court found for the defendant on the second and third counts. As to the second count, the trial court fround that exemplary damages based on reckless, willful and wanton misconduct are not recoverable. The trial court also found that the third count, alleging negligent assault and battery, was encompassed in the first count and did not consider the third count.

[4] Under the Restatement (Second) of Torts § 283B is the following: "Comment:

"a. If the actor is a child, his mental deficiency is taken into account. See § 283 A.

"b. The rule that a mentally deficient adult is liable for his torts is an old one, dating back at least to 1616, at a time when the action for trespass rested upon the older basis of strict liability, without regard to any fault of the individual. Apart from mere historical survival, its persistence in modern law has been explained on a number of different grounds. These are as follows:

"1. The difficulty of drawing any satisfactory line between mental deficiency and those variations of temperament, intellect, and emotional balance which cannot, as a practical matter, be taken into account in imposing liability for damage done.

"2. The unsatisfactory character of the evidence of mental deficiency in many cases, together with the ease with which it can be feigned, the difficulties which the triers of fact must encounter in determining its exis-

sidered this issue have held insane persons liable for their intentional torts. See 4 Restatement (Second), Torts § 895J. This rule is reflected in the Restatement (Second) of Torts § 283B, which provides: "Unless the actor is a child, his insanity or other mental deficiency does not relieve the actor from liability for conduct which does not conform to the standard of a reasonable man under like circumstances."[5] The majority rule has been applied to cases involving intentional homicide. See *Aetna Casualty & Surety Co.* v. *Porter,* 181 F. Sup. 81 (D.D.C. 1960); *Parke* v. *Dennard,* 218 Ala. 209, 118 So. 396 (1928); *McIntyre* v. *Sholty,* 121 Ill. 660, 13 N.E. 239 (1887); *Vosnos* v. *Perry,* 43 Ill. App. 3d 834, 357 N.E.2d 615 (1976); *Seals* v. *Snow,* 123 Kan. 88, 254 P. 348 (1927); *Bolen* v. *Howard,* 452 S.W.2d 401 (Ky. 1970); *Jewell* v. *Colby,* 66 N.H. 399, 24 A. 902 (1890); *Shapiro* v. *Tchernowitz,* 3 Misc. 2d 617, 155 N.Y.S.2d 1011 (1956); *Ballinger* v. *Rader,* 153 N.C. 488, 69 S.E. 497 (1910); *Ross* v. *York,* 233 S.W.2d 347 (Tex. Civ. App. 1950).

tence, nature, degree, and effect; and some fear of introducing into the law of torts the confusion which has surrounded such a defense in the criminal law. Although this factor may be of decreasing importance with the continued development of medical and psychiatric science, it remains at the present time a major obstacle to any allowance for mental deficiency.

"3. The feeling that if mental defectives are to live in the world they should pay for the damage they do, and that it is better that their wealth, if any, should be used to compensate innocent victims than that it should remain in their hands.

"4. The belief that their liability will mean that those who have charge of them or their estates will be stimulated to look after them, keep them in order, and see that they do not do harm.

"c. Insane persons are commonly held liable for their intentional torts. While there are very few cases, the same rule has been applied to their negligence. As to mental deficiency falling short of insanity, as in the case of stupidity, lack of intelligence, excitability, or proneness to accident, no allowance is made, and the actor is held to the standard of conduct of a reasonable man who is not mentally deficient, even though it is in fact beyond his capacity to conform to it."

[5] See footnote 3, supra, for the comment pertaining to the Restatement (Second) of Torts § 283B.

Commentators trace the majority rule back to the dictum of a seventeenth century English case.[6] The majority rule is not, however, without criticism. For example, Professor Bohlen has stated: "[W]here a liability, like that for the impairment of the physical condition of another's body or property, is imposed upon persons capable of fault only if they have been guilty of fault, immaturity of age or mental deficiency, which destroys the capacity for fault, should preclude the possibility of liability. . . . But so long as it is accepted as a general principle that liability for injuries to certain interests are to be imposed only upon those guilty of fault in causing them, it should be applied consistently and no liability should be imposed upon those for any reason incapable of fault." F. Bohlen, "Liability in Tort of Infants and Insane Persons," 23 Mich. L. Rev. 9, 31–32 (1924–25). For a similar view, see R. Ague, "The Liability of Insane Persons in Tort Actions," 60 Dick. L. Rev. 211 (1956). Nonetheless, we are persuaded by the proponents of the majority rule, especially when the cases in which it has been applied are examined.

A leading case is *Seals* v. *Snow*, 123 Kan. 88, 254 P. 348 (1927). In *Seals*, the widow of Arthur Seals brought

---

[6] The English case is *Weaver* v. *Ward*, Hobart 134, 80 Eng. Rep. 284 (1616). *Weaver* is analyzed in an article by Professor F. Bohlen, "Liability in Tort of Infants and Insane Persons," 23 Mich. L. Rev. 9 (1924–25). "In *Weaver* v. *Ward*, [supra,] the defendant had pleaded to an action of trespass for assault and battery that he and the [plaintiff] were members of a trained band, and that while they were skirmishing with their muskets against another band, the defendant 'by chance and misadventure and against his will in discharging his piece' wounded the plaintiff. Upon the demurrer to this plea, judgment was given to the plaintiff, the court saying that 'no man should be excused of a trespass' merely because he did not intend the harm which he had caused, but must show that it was 'uterly without his fault,' and stating as an instance of liability without intention 'that if a lunatic kills a man this shall not be a felony,' because 'felony must be done *animo felonico*.' 'Yet in trespass which tends only to give damages according to a hurt or loss, it is not so.' " F. Bohlen, supra, 16.

a civil action against Martin Snow to recover damages for the death of her husband. Several interrogatories were submitted to the jury, including: "Was Martin Snow insane when he shot Arthur Seals? A. Yes. If you answer the last question in the affirmative, was Martin Snow at the time he shot Arthur Seals able to distinguish right from wrong? A. No." Id., 89. The jury returned a verdict for the plaintiff. In upholding the ensuing judgment, the Kansas Supreme Court stated: "The defendant challenges the doctrine generally sustained by the courts that an insane person is liable to make compensation for his torts. It is conceded that the great weight of authority is that an insane person is civilly liable for his torts. This liability has been based on a number of grounds, one that where one of two innocent persons must suffer a loss, it should be borne by the one who occasioned it. Another, that public policy requires the enforcement of such liability in order that relatives of the insane person shall be led to restrain him and that tort-feasors shall not simulate or pretend insanity to defend their wrongful acts causing damage to others, and that if he was not liable there would be no redress for injuries, and we might have the anomaly of an insane person having abundant wealth depriving another of his rights without compensation." Id., 90.

Like *Seals,* another homicide case applying the majority rule is *McIntyre* v. *Sholty,* 121 Ill. 660, 13 N.E. 239 (1887), where recovery was allowed against an insane person's estate for the wrongful killing of the plaintiff's wife. The court reasoned: "There is, to be sure, an appearance of hardship in compelling one to respond for that which he is unable to avoid for want of the control of reason. But the question of liability in these cases is one of public policy. If an insane person is not held liable for his torts, those interested in his estate, as relatives or otherwise, might not have

a sufficient motive to so take care of him as to deprive him of opportunities for inflicting injuries upon others. There is more injustice in denying to the injured party the recovery of damages for the wrong suffered by him, than there is in calling upon the relatives or friends of the lunatic to pay the expense of his confinement, if he has an estate ample enough for that purpose. The liability of lunatics for their torts tends to secure a more efficient custody and guardianship of their persons. Again, if parties can escape the consequences of their injurious acts upon the plea of lunacy, there will be a strong temptation to simulate insanity with a view of masking the malice and revenge of an evil heart." Id., 664–65.

Our adoption of the majority rule holding insane persons civilly liable, in appropriate circumstances, for their intentional torts finds support in other Connecticut case law. We have elsewhere recognized the vitality of the common law principle that " 'where one of two innocent persons must suffer loss from an act done, it is just that it should fall on the one who caused the loss rather than upon the other who had no agency in producing it and could not by any means have avoided it.' " *Verrilli* v. *Damilowski,* 140 Conn. 358, 360, 100 A.2d 462 (1953), citing *Granniss* v. *Weber,* 107 Conn. 622, 625, 141 A. 877 (1928); *Grissell* v. *Housatonic R. Co.,* 54 Conn. 447, 461, 9 A. 137 (1887).

## II

We now turn to the defendant's claim that the trial court should have applied a two-pronged analysis to his claim. The first prong is whether the defendant intended the act that produced the injury. The defendant argues that for an act to be done with the requisite intent, the act must be an external manifestation of the actor's will. The defendant specifically relies on the Restatement (Second) of Torts § 14, comment b,

for the definition of what constitutes an "act," where it is stated that "a muscular movement which is purely reflexive or the convulsive movements of an epileptic are not acts in the sense in which that word is used in the Restatement. So too, movements of the body during sleep or while the will is otherwise in abeyance are not acts. An external manifestation of the will is necessary to constitute an act, and an act is necessary to make one liable [for a battery] . . . ." The defendant argues that if his "activities were the external manifestations of irrational and uncontrollable thought disorders these activities cannot be acts for purposes of establishing liability for assault and battery." We disagree.

We note that we have not been referred to any evidence indicating that the defendant's acts were reflexive, convulsive or epileptic. Furthermore, under the Restatement (Second) of Torts § 2, "act" is used "to denote an external manifestation of the actor's will and does not include any of its results, even the most direct, immediate, and intended." Comment b to this section provides in pertinent part: "A muscular reaction is always an act unless it is a purely reflexive reaction in which the mind and will have no share." Although the trial court found that the defendant could not form a rational choice, it did find that he could make a schizophrenic or crazy choice. Moreover, a rational choice is not required since "[a]n insane person may have an intent to invade the interests of another, even though his reasons and motives for forming that intention may be entirely irrational." 4 Restatement (Second), Torts § 895J, comment c. The following example is given in the Restatement to illustrate the application of comment c: "A, who is insane believes that he is Napoleon Bonaparte, and that B, his nurse, who confines him in his room, is an agent of the Duke of Wellington, who is endeavoring to prevent his arrival on

the field of Waterloo in time to win the battle. Seeking to escape, he breaks off the leg of a chair, attacks B with it and fractures her skull. A is subject to liability to B for battery."

We recognize that the defendant made conflicting statements about the incident when discussing the homicide. At the hospital on the evening of the homicide the defendant told a police officer that his father-in-law was a heavy drinker and that he used the beer bottle for that reason. He stated he wanted to make his father-in-law suffer for his bad habits and so that he would realize the wrong that he had done. He also told the police officer that he was a supreme being and had the power to rule the destiny of the world and could make his bed fly out of the window. When interviewed by Dr. Borden, the defendant stated that he believed that his father-in-law was a spy for the red Chinese and that he believed his father-in-law was not only going to kill him, but going to harm his infant child so that he killed his father-in-law in self-defense. The explanations given by the defendant for committing the homicide are similar to the illustration of irrational reasons and motives given in comment c to § 895J of the Restatement, set out above.

Under these circumstances we are persuaded that the defendant's behavior at the time of the beating and shooting of Polmatier constituted an "act" within the meaning of comment b, § 2, of the Restatement. Following the majority rule in this case, we conclude that the trial court implicitly determined that the defendant committed an "act" in beating and shooting Polmatier. Accordingly, the trial court did not err as to the first prong of the defendant's claim.

### III

The second prong of the defendant's claim is that the trial court erred in failing to determine whether the

defendant intended the resulting injury to the decedent. The defendant argues in his brief that "[t]he trial court must satisfy the second prong of its intentional tort analysis with a finding that the defendant acted 'for the *purpose* of causing' [1 Restatement, Torts § 13, comment d] or with a '*desire* to cause' [1 Restatement (Second), Torts § 8A] the resulting injury." (Emphasis added.) This argument is more persuasive in its application to proof of the elements of crimes than in its relation to civil liability.

In the criminal law the "act" and the "intent" of the actor are joined to determine the culpability of the offender. For example, the allegations of the essential elements of murder are as follows: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person." General Statutes § 53a-54a (a). The defendant claims that "[i]ntent need not involve ill will or malice, but must include a design, purpose and intent to do wrong and inflict the injury."[7] Under the Restatement, "intent" is used "to denote that the actor desires

[7] The defendant refers to *Rogers* v. *Doody,* 119 Conn. 532, 178 A. 51 (1935), in support of this statement. In *Rogers* v. *Doody,* supra, the defendant obtained a judgment against the plaintiff on a cause of action based on the plaintiff's reckless disregard of the rights of others in the operation of a motor vehicle in which the defendant's intestate was riding as a guest. After the defendant's judgment the plaintiff was adjudged as bankrupt and was duly discharged of all of his provable debts by the United States District Court for the District of Connecticut. Thereafter, the defendant threatened to take out execution on the judgment and to levy the same upon the property of the plaintiff and in default thereof upon his body. The plaintiff brought an action seeking to have the defendant enjoined from the threatened action. The trial court granted the injunction. The issue on appeal was whether the plaintiff's discharge in bankruptcy released him from the judgment. The United States Backruptcy Act provides that " 'a discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as . . . (2) are liabilities for . . . willful and malicious injuries to the person or property of another.' " Id., 533. On appeal the question framed was: "Is the judgment obtained by a guest in a motor vehicle against its owner or operator for injuries received in an accident caused by the lat-

to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." 1 Restatement (Second), Torts § 8A. Comment b to § 8A of the Restatement provides in pertinent part: "All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." We have stated that "[i]t is not essential that the precise injury which was done be the one intended." *Alteiri* v. *Colasso*, 168 Conn. 329, 334, 362 A.2d 798 (1975).

As discussed above, the defendant gave the police and Borden several reasons why he killed Polmatier. Under comment c to § 895J of the Restatement, it is not necessary for a defendant's reasons and motives for forming his intention to be rational in order for him to have the intent to invade the interests of another. Considering his statements to the police and to Borden that he intended to punish Polmatier and to kill him, we are persuaded that the defendant intended to beat and shoot him. Because the defendant was found not guilty by reason of insanity, it is uncontested in this civil action that he was incapable of forming the intent necessary for criminal responsibility for Polmatier's death. Under General Statutes § 52-555,[8] the wrongs-

---

ter's reckless disregard of his rights a liability for willful and malicious injury to person or property within the meaning of . . . the Bankruptcy Act?" Id. This court answered the question in the negative, and found no error in the action of the trial court in granting the injunction. It is readily apparent that *Rogers* is unlike this case, and any statements in the case beyond the answer to the question framed by the court are dicta and do not require our response or consideration at this time.

[8] "[General Statutes] Sec. 52-555. ACTIONS FOR INJURIES RESULTING IN DEATH. In any action surviving to or brought by an executor or adminis-

ful death statute, however, intent is not an essential element of the cause of action.

## IV

The remaining claims asserted by the defendant are that the trial court erred in: (1) finding the defendant liable for an intentional assault and battery where the findings of fact compelled a conclusion that the defendant lacked the requisite intent to commit an intentional assault and battery; (2) finding the defendant liable for an intentional assault and battery in the absence of any fault by the defendant; (3) imposing liability on insane persons for their tortious conduct regardless of fault, without justification on any public policy grounds; (4) applying Connecticut case law that is not conclusive regarding liability of the insane for tortious conduct; and (5) finding the defendant liable in the absence of finding of intent contrary to current Connecticut law and in violation of his right to equal protection of the laws. We have considered these claims and find them without merit.

There is no error.

In this opinion the other justices concurred.

---

trator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses, provided no action shall be brought to recover such damages and disbursements but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of."