2005 UT 54

**Tracy D. WAGNER and Robert W. Wagner, Plaintiffs and Petitioners,**

v.

**STATE of Utah, Utah Department of Human Services, and Utah State Development Center, Defendants and Respondents.**

**No. 20040405.**

Supreme Court of Utah.

Aug. 30, 2005.

D. David Lambert, Leslie W. Slaugh, Ryan D. Tenney, Provo, for plaintiffs.

Mark L. Shurtleff, Att'y Gen., Barry G. Lawrence, Nancy L. Kemp, Asst. Att'ys Gen., Salt Lake City, for defendants.

WILKINS, Associate Chief Justice:

¶ 1 Tracy and Robert Wagner seek review of the court of appeals' ruling that the trial court properly granted a rule 12(b)(6) motion dismissing their suit against the State. The Wagners' suit, which sought recovery for injuries Mrs. Wagner sustained when a mentally handicapped man attacked her while he was in the custody of state employees, was dismissed at the trial court, and affirmed at the court of appeals, on the ground that the attack constituted a battery, a tort for which the State has retained immunity from suit. The Wagners then petitioned this court for certiorari, which we granted. We now affirm.

## BACKGROUND

¶ 2 When reviewing a 12(b)(6) motion, we recite the facts in a light most favorable to the non-moving party, though there is no dispute in this case as to the facts. *Higgins v. Salt Lake County*, 855 P.2d 231, 233 (Utah 1993).

¶ 3 Tracy Wagner was standing in a customer service line at a K–Mart store in American Fork, Utah, when she was suddenly and inexplicably attacked from behind. The Wagners' alleged that Sam Giese, a mentally disabled patient of the Utah State Development Center ("USDC"), "became violent, took [Mrs. Wagner] by the head and hair, threw her to the ground, and otherwise acted in such a way as to cause serious bodily injury to her."

¶ 4 USDC employees had accompanied Mr. Giese to K–Mart as part of his treatment program and had remained in K–Mart to supervise him. While this particular episode of violence was sudden, it was not altogether unpredictable. Mr. Giese had a history of violent conduct and presented a potential danger to the public if not properly supervised.

¶ 5 Mrs. Wagner and her husband subsequently filed a complaint against USDC and the Utah Department of Human Services, the state agency under which USDC operates, for failing to "properly supervise the activity of" Mr. Giese while he was in its care. Because the defendants to this matter are all governmental entities, they moved to dismiss the complaint under Utah Rule of Civil Procedure 12(b)(6) for failure to state a claim, arguing that Mrs. Wagner's injuries arose out of a battery, a tort for which the government is immune from suit. Thus, under the Governmental Immunity Act, Utah Code Ann. § 63–30–10(2) (Utah 1997) (repealed 2004), the defendants could not be held liable for injuries arising out of the battery here. The district court agreed with the government and dismissed the Wagners' complaint, holding that because Giese initiated a contact with "deliberate" intent, his attack constituted a battery and the government was immune under the statute.

¶ 6 The Wagners appealed the decision to the court of appeals, arguing that the intentional tort of battery requires proof of both an intent to make a contact and an intent to cause harm thereby, and because Mr. Giese was mentally incompetent to formulate the intent to cause harm, his attack could not constitute a battery as a matter of law. The defendants, on the other hand, maintained that a person need only intend to make a harmful or offensive contact in order for that contact to constitute a battery upon another. A person need not intend to cause harm or appreciate that his contact will cause harm so

long as he intends to make a contact, and that contact is harmful.

¶ 7 Both parties filed briefs with the court of appeals, but oral argument was not heard on the matter. Instead, the court issued a memorandum opinion affirming the district court's order of dismissal. *Wagner v. Utah Dep't of Human Servs.*, No. 20030106–CA, 2004 WL 530728, *3, 2004 Utah App. LEXIS 282, at *8 (Utah Ct.App. Mar.18, 2004) (mem.). The court of appeals reasoned that Mr. Giese's attack on Mrs. Wagner constituted a battery under Utah jurisprudence interpreting the Governmental Immunity Act. *Id.*, 2004 WL 530728, *1, at *5 The court distinguished the case at bar from the case the Wagners cited in support of their argument, finding that Mr. Giese's attack, unlike the incident involved in the cited case, " 'creat[ed] a substantial certainty [that] harm' " would arise out of the contact. *Id.*, 2004 WL 530728, *2, at *6 (quoting *Matheson v. Pearson*, 619 P.2d 321, 323 (Utah 1980)).

¶ 8 Looking to outside case law as well, the court of appeals found that the decisions reached in other jurisdictions supported its conclusion that the resolution of the issue turned not on whether the perpetrator of the attack intended to cause harm, but rather upon " 'whether the injury was perpetrated deliberately or accidentally.' " *Id.* at *7 (quoting *Miele v. United States*, 800 F.2d 50, 52 (2d Cir.1986)). The court of appeals joined the courts of other jurisdictions, both state and federal, in declining to incorporate a requirement that the perpetrator have a certain mental state at the moment of the attack in order for that attack to constitute a battery. The Wagners appealed to this court, and we have jurisdiction pursuant to Utah Code section 78-2-2(3)(a) (2002).

**STANDARD OF REVIEW**

██ ¶ 9 When reviewing a court of appeals decision affirming a grant of a rule 12(b)(6) motion to dismiss, "we review the decisions of the court of appeals rather than that of the trial court ... for correctness." *Taghipour v. Jerez*, 2002 UT 74, ¶ 8, 52 P.3d 1252. Because we are reviewing a rule 12(b)(6) motion, we must "accept the material allegations in the complaint as true and interpret those facts and all reasonable inferences drawn therefrom in a light most favorable to the plaintiff as the non-moving party." *Russell Packard Dev. v. Carson*, 2005 UT 14, ¶ 3, 108 P.3d 741. We will affirm the court of appeals' dismissal of the case only if, after granting such deference to the Wagners' factual presentation, we still find that they have failed to state a claim upon which relief can be granted. Utah R. Civ. P. 12(b)(6).

**ANALYSIS**

**I. GOVERNMENTAL IMMUNITY ACT**

██ ¶ 10 In interpreting any statute, rules of statutory construction require the court to "first look[ ] to the statute's plain language, and give effect to the plain language unless the language is ambiguous." *Blackner v. State*, 2002 UT 44, ¶ 12, 48 P.3d 949. At the time of the incident in this case, the Governmental Immunity Act read as follows:

> Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if the injury arises out of . . . :
>
> (2) assault, battery, [or] false imprisonment. . . .

Utah Code Ann. § 63–30–10(2) (Utah 1997) (repealed 2004).

¶ 11 This court has previously held in governmental immunity cases that the State is immunized against a negligence action if the action arises out of an assault or battery. *Tiede v. State*, 915 P.2d 500, 502–03 (Utah 1996) (holding the State immune from suit for negligence in the shooting deaths of two and the assault and battery upon three others under the assault and battery exception to the immunity waiver); *Higgins v. Salt Lake County*, 855 P.2d 231, 241 (Utah 1993) (county immune from suit under the battery exception where a mentally ill patient at a county facility stabbed a child); *Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1166 (Utah 1993) (school district immune from suit under the battery exception for failing to properly supervise high school stu-

dents where those students severely beat another student during a physical education class).

¶ 12 Utah courts make three inquiries to determine whether the government is immune from suit under the Governmental Immunity Act. First, courts must ascertain whether the activity was a governmental function and thereby entitled to blanket immunity under the Act. Second, if the activity constituted a governmental function, courts must then look to see whether the State has waived immunity under another section of the Act. Finally, courts must determine whether there is an exception to the waiver of immunity that retains immunity against suit for the cause of action in the particular case. *Taylor v. Ogden City Sch. Dist.*, 927 P.2d 159, 162 (Utah 1996).

¶ 13 Both sides concede that "the first two factors do not shield the State" from suit. *Wagner v. State*, No. 20030106–CA, 2004 WL 530728, *1, 2004 Utah App. LEXIS 282, *4. The State does argue, however, that the third inquiry requires that the suit against the State be dismissed under the Governmental Immunity Act because Mr. Giese's attack constituted a battery, an exception to the waiver of immunity under former section 63–30–10(2).

¶ 14 The Wagners argue that Mr. Giese's attack could not legally constitute a battery because that intentional tort requires the actor to intend harm or offense through his deliberate contact, an intent Mr. Giese was mentally incompetent to form. The State, on the other hand, argues that the only intent required under the statute is simply the intent to make a contact. The contact must be harmful or offensive by law, but the actor need not intend harm so long as he intended contact.

¶ 15 The outcome of this case, then, turns upon which interpretation of the definition of battery is correct. Accordingly, we turn our attention now to the law of battery as defined in the Restatement.

## II. THE RESTATEMENT DEFINITION OF BATTERY

¶ 16 While there is some variation among the definitions of the tort of battery, *Prosser and Keeton on the Law of Torts* § 8, at 33–34 (W. Page Keeton et al. eds., 5th ed.1984) (hereinafter *Prosser*), Utah has adopted the Second Restatement of Torts to define the elements of this intentional tort, including the element of intent. *Tiede v. State*, 915 P.2d 500, 503 n. 3. The Restatement represents a "concept [of the law] consistent with the most common usage in judicial opinions in tort cases." *Prosser, supra*, § 8, at 34. The Restatement reads:

> An actor is subject to liability to another for battery if
>
> (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
>
> (b) a harmful contact with the person of the other directly or indirectly results.

Restatement (Second) of Torts § 13 (1965).

¶ 17 The only point of dispute in this case is whether the language of the Restatement requires Mr. Giese to have intended not only to make physical contact with Mrs. Wagner, which the Wagners concede he did, but also to have intended the contact to be harmful or offensive. In other words, is a battery committed only when the actor intends for his contact to harm or offend, or is it sufficient that the actor deliberately make physical contact, which contact is harmful or offensive by law? Determining the answer requires a careful dissection of the elements of battery and the meaning of intent.

¶ 18 We conclude that the plain language of the Restatement, the comments to the Restatement, Prosser and Keeton's exhaustive explanation of the meaning of intent as described in the Restatement, and the majority of case law on the subject in all jurisdictions including Utah, compels us to agree with the State that only intent to make contact is necessary.

¶ 19 In order for a contact to constitute a battery at civil law, two elements must be satisfied. First, the contact must have been deliberate. Second, the contact must have been harmful or offensive at law. We hold that the actor need not intend that his contact be harmful or offensive in order

to commit a battery so long as he deliberately made the contact and so long as that contact satisfies our legal test for what is harmful or offensive.

¶ 20 We first address the intent element of battery to explain our holding. Next, we discuss how the limited legal nature of harmful or offensive contact restricts the types of contacts for which actors may be potentially liable.

### A. Legal Intent to Commit a Battery

¶ 21 Prosser described intent as "one of the most often misunderstood legal concepts." *Prosser, supra*, § 8, at 33. Because intent is also "one of the most basic, organizing concepts of legal thinking," *id.*, it is crucial that the term is properly defined and understood. We begin our analysis with the language in the Restatement itself.

¶ 22 The Restatement defines a battery as having occurred where "[an actor] acts intending to cause a harmful or offensive contact." Restatement (Second) of Torts § 13. The comments to the definition of battery refer the reader to the definition of intent in section 8A. *Id.* § 13 cmt. c. Section 8A reads:

The word "intent" is used throughout the Restatement of this Subject to denote that the actor desires to cause *the consequences of his act*, or that he believes that the consequences are substantially certain to result from it.

*Id.* § 8A (emphasis added).

¶ 23 Although this language might not immediately seem to further inform our analysis, the comments to this section do illustrate the difference between an intentional act and an unintentional one: the existence of intent as to the contact that results from the act. Because much of the confusion surrounding the intent element required in an intentional tort arises from erroneously conflating the act with the consequence intended, we must clarify these basic terms as they are used in our law before we analyze the legal significance of intent as to an act versus intent as to the consequences of that act.

¶ 24 Section 2 of the Restatement (Second) of Torts defines the term "act" as "an external manifestation of the actor's will and does not include any of its results, even the most direct, immediate, and intended." *Id.* § 2. To illustrate this point, the comments clarify that when an actor points a pistol at another person and pulls the trigger, the act is the pulling of the trigger. *Id.* at cmt. c. The consequence of that act is the "impingement of the bullet upon the other's person." *Id.* It would be improper to describe the act as "the shooting," since the shooting is actually the conflation of the act with the consequence. For another example, the act that has taken place when one intentionally strikes another with his fist "is only the movement of the actor's hand and not the contact with the others body immediately established." *Id.* Thus, presuming that the movement was voluntary rather than spastic, whether an actor has committed an intentional or negligent contact with another, and thus a tort sounding in battery or negligence, depends not upon whether he intended to move his hand, but upon whether he intended to make contact thereby.

¶ 25 The example the Restatement sets forth to illustrate this point is that of an actor firing a gun into the Mojave Desert. Restatement (Second of Torts) § 8A cmt. a. In both accidental and intentional shootings, the actor intended to pull the trigger. *Id.* Battery liability, rather than liability sounding in negligence, will attach only when the actor pulled the trigger in order to shoot another person, or knowing that it was substantially likely that pulling the trigger would lead to that result. *Id.* § 8A cmts. a & b. An actor who intentionally fires a bullet, but who does not realize that the bullet would make contact with another person, as when "the bullet hits a person who is present in the desert without the actor's knowledge," is not liable for an intentional tort. *Id.*

¶ 26 A hunter, for example, may intentionally fire his gun in an attempt to shoot a bird, but may accidentally shoot a person whom he had no reason to know was in the vicinity. He intended his act, pulling the trigger, but not the contact between his bullet and the body of another that resulted from that act. Thus, he intended the act but not the consequence. It is the consequential contact with the other person that the actor must either

intend or be substantially certain would result, not the act—pulling the trigger—itself. He is therefore not liable for an intentional tort because his intentional act resulted in an unintended contact. On the other hand, the actor is liable for an intentional tort if he pulled the trigger intending that the bullet released thereby would strike someone, or knowing that it was substantially likely to strike someone as a result of his act. *Id.* at cmts. a & b.

¶ 27 Can an actor who acknowledges that he intentionally pulled the trigger, and did so with the intent that the bullet make contact with the person of another, defeat a battery charge if he can show that he did so only as a joke, or did not intend that the contact between the bullet and the body of the person would cause harm or offense to that person? The Wagners argue that such a showing would provide a full defense to a battery charge because the actor lacked the necessary intent to harm.

¶ 28 We agree with the Wagners that not all intentional contacts are actionable as batteries, and that the contact must be harmful or offensive in order to be actionable. We do not agree, however, that, under our civil law, the actor must appreciate that his act is harmful or offensive in order for his contact to constitute a battery. Before we resort to case law to interpret the language and application of our battery law, we can simply turn first to the plain language of the law itself for a clear refutation of the Wagners' theory.

¶ 29 The plain language of the comments makes clear that the only intent required to commit a battery is the intent to make a contact, not an intent to harm, injure, or offend through that contact. Restatement (Second) of Torts § 13. So long as the actor intended the contact, "it is immaterial that the actor is not inspired by any personal hostility to the other, or a desire to injure him." *Id.* § 13 cmt. c. The actor will be liable for battery even if he honestly but "erroneously believe[d] that ... the other has, in fact, consented to [the contact]." *Id.* In fact, even a healing contact motivated by a helpful intent, as in an act of medical assistance, is actionable as a battery if the actor did not in fact have permission to make the

contact. *Id.* The linchpin to liability for battery is not a guilty mind, but rather an intent to make a contact the law forbids. The actor need not appreciate that his contact is forbidden; he need only intend the contact, and the contact must, in fact, be forbidden.

¶ 30 The Restatement comments illustrate this principle using two examples. In the first, an actor playing a good-natured practical joke, under the mistaken belief that he has his victim's consent to make the contact, has committed a battery. *Id.* In the second example, the healing contact of a physician, acting with helpful intent but against the patient's wishes, constituted a battery. *Id.* The fact that the procedure preserved the patient's life does not change the result. *Id.; see, e.g., Meyers v. Epstein,* 232 F.Supp.2d 192, 198 (S.D.N.Y.2002) (holding that "the only intent necessary to support a claim of battery is simply the intent to make contact" and a physician who did not have specific permission to do so has committed a battery); *Mohr v. Williams,* 95 Minn. 261, 104 N.W. 12, 16 (1905), *overruled on other grounds by Genzel v. Halvorson,* 248 Minn. 527, 80 N.W.2d 854 (1957) (holding that a physician committed a battery even though he acted with helpful intent because he did not have the patient's consent to perform surgery on her right ear instead of her left); *Mink v. Univ. of Chicago,* 460 F.Supp. 713, 718 (N.D.Ill.1978) (holding for plaintiffs in their negligence action against physicians because "[t]he requisite element of intent is ... met, since the plaintiffs need show only an intent to bring about the contact; an intent to do harm is not essential to the action.").

¶ 31 If a physician who has performed a life-saving act of assistance upon an unconsenting patient with the hope of making that patient whole is liable for battery under the express terms of the Restatement, and a practical joker who makes a contact which he thinks will be taken as a joke or to which he thinks his victim has actually given consent is likewise liable, we cannot then say that other actors must intend harm through their deliberate contact in order to perfect a battery. It is beyond argument that the Restatement itself requires neither a "desire to injure" nor a realization that the contact is injurious or

offensive. Restatement (Second) of Torts § 13. Instead, the actor need only intend the contact itself, and that contact must fit the legal definition of harmful or offensive.

¶ 32 Prosser echoed the Restatement when he clarified that "[t]he intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do harm. Rather, it is an intent to bring about a result which will invade the interests of another in a way that the law forbids." *Prosser, supra,* § 8, at 36. While it may be argued that this statement means that the actor must intend that the contact be forbidden, all ambiguity on the point is eviscerated by Prosser's next comment, in which he lists as one type of intentional tort the act of "intentionally invading the rights of another under a mistaken belief of committing no wrong." *Id.* § 8, at 37.

¶ 33 Though Prosser recognizes that the plaintiff will often recover to the greatest extent "where the [defendant's] motive is a malevolent desire to do harm," he nonetheless ascribes the malevolence to motive, not intent, and labels the less culpable act of innocent invasion of another's rights as an *intentional* invasion. *Id.* These comments only underscore the point repeated throughout both the Restatement and Prosser's analysis that the only intent required is the intent to make a contact to which the recipient has not consented, and the actor need not appreciate that the victim has not consented.

¶ 34 In Prosser's analysis of battery itself, he states that, in order for the contact to constitute a battery, "[t]he act must cause, and must be intended to cause, an unpermitted contact." *Id.* § 9, at 41. In discussing the difference between battery and mere negligence, he focused upon "the risk that contact will result" from the act, not the risk that harm would result from the contact. *Id.* Yet, if battery required an intent to harm or offend, or to realize that the contact was harmful or offensive or otherwise unpermitted, the proper focus of a discussion distinguishing between negligent and intentional conduct would be upon the risk that harm or offense would result from the contact. Instead, the focus was upon whether the contact itself, not the harm resulting therefrom,

was intended or resulted from mere inadvertence.

¶ 35 The Wagners' argument that an actor lacks intent to commit a battery where he deliberately makes physical contact that is harmful or offensive so long as he does not realize his contact is harmful or offensive is simply in direct conflict with the commentaries in the Restatement itself and other commentaries on the law. As Prosser states, "a defendant may be liable [for battery] when intending only a joke, or even a compliment, as where an unappreciated kiss is bestowed without consent, or a misguided effort is made to render assistance." *Id.* § 9, 41–42.

¶ 36 The Wagners' theory is also in conflict with the majority of case law on the subject in both federal and state courts, including Utah. *See, e.g.,* 4 Restatement (Second) of Torts § 895J; *id.* § 238B; *Meyers v. Epstein,* 232 F.Supp.2d 192, 198 (S.N.D.Y.2002); *Cheney v. Studstrup,* 32 F.Supp.2d 1278, 1284 & n. 6 (D.Utah 1998); *Delahanty v. Hinckley,* 799 F.Supp. 184, 187 (D.D.C.1992); *Williams v. Kearbey,* 13 Kan.App.2d 564, 775 P.2d 670, 673–74 (1989); *Polmatier v. Russ,* 206 Conn. 229, 537 A.2d 468, 469–70 (1988). While there is a dearth of case law on this precise subject from Utah state courts, our cases that do touch upon the intent element of battery generally support the majority rule to which we subscribe in this decision.

¶ 37 For instance, in *Wright v. University of Utah,* 876 P.2d 380, 387 (Utah Ct.App. 1994), *cert. denied,* 883 P.2d 1359 (Utah 1994), the court of appeals rejected Mrs. Wright's argument that the autistic university employee who struck her could not have committed a battery because he lacked the mental capacity to form the requisite intent. The court discussed her argument in the context of explaining why it denied her request to amend her complaint to include a pure negligence charge, justifying its denial on the basis that "a party is not entitled to file an amended complaint when the new claim is legally insufficient or futile." *Wright,* 876 P.2d at 387.

¶ 38 Describing Wright's attempt to circumvent the governmental immunity statute by recasting her claim as one sounding in

negligence rather than battery as "fruitless, albeit creative," the court looked to analogous federal cases to dismantle her argument. *Id.* at 386–87. In accordance with the federal courts' analysis of the parallel provision in the federal immunity statute, Federal Tort Claims Act, 28 U.S.C. § 2680(h) (2000), the court of appeals concluded that "[n]othing in the Act or in our case law indicates that the distinction Wright champions was contemplated by the legislature to determine whether immunity exists under section 63–30–10(2). The focus is on the result, not the circumstances leading thereto." *Wright*, 876 P.2d at 387.

¶ 39 We have also implicitly held that mental capacity is not relevant to a liability determination in other cases involving civil battery. In *Higgins v. Salt Lake County*, 855 P.2d 231, 233 (Utah 1993), the plaintiffs sued Salt Lake County for negligently supervising a mental patient who attacked and repeatedly stabbed their ten-year-old daughter. Though the Higginses did not raise the argument that the attacker's insanity adjudication meant that her attack could not constitute a battery, we found that the battery exception applied. *Id.* at 240. The patient's schizophrenia and marginal intelligence did not persuade us that her actions could not amount to a battery for lack of requisite intent. *Id.* at 241.

¶ 40 The Wagners correctly point out that our decision in *Matheson v. Pearson*, 619 P.2d 321 (Utah 1980), does not conform to the rule we have applied here. In *Matheson*, a maintenance man sustained injuries when a student threw a piece of candy from an open window at him, striking him in the back. *Id.* at 321–22. The only way the injured plaintiff could recover against the student for his injuries was if the act sounded in negligence rather than battery, since the statute of limitations on battery had already run by the time the case was filed. *Id.* at 322. We held that battery requires an intent to harm, not just an intent to make contact, and that the adolescent prank did not involve the requisite intent. *Id.* at 322–23. Thus, the injured maintenance man was able to proceed with his suit on a theory of negligence.

¶ 41 The *Matheson* case, however, was decided before we expressly adopted the Restatement definition of battery, and it has been superceded by more recent case law on the subject of intent. The reasoning promulgated in *Matheson* directly contradicts the very example of battery the Restatement provided. Restatement (Second) of Torts § 13 cmt. c. ("One who plays dangerous practical jokes on others takes the risk that his victims may not appreciate the humor of his conduct. . . ."). *Matheson* is not a correct interpretation of the Restatement on battery and it is hereby overruled. Instead, we ratify the position taken by the majority of federal and state courts in rejecting the argument that the actor must intend harm or offense through his contact in order for that contact to constitute a battery.

¶ 42 The discussion in *Miele v. United States*, 800 F.2d 50 (2d Cir.1986), is informative on this point. There, the Second Circuit held that the family of a child blinded and disfigured when an insane AWOL soldier attacked him with sulphuric acid was barred by the immunity doctrine from recovering against the government, despite the family's argument that the insane soldier could not form the requisite intent to commit a battery. The court held that the attacker's mental capacity was irrelevant to the question of whether the actor committed a battery for two reasons.

¶ 43 First, the government's fault in the attack "does not change depending upon whether the aggressor was sane or insane at the time." *Id.* at 52. "While an insane employee may or may not be less culpable personally for such attacks, the question of whether the injury was perpetrated deliberately or accidentally does not depend upon the employee's sanity." *Id.* Second, under the common law, "one who suffers from deficient mental capacity is not immune from tort liability solely for that reason." *Id.* at 53, (citing W.L. Prosser, *The Law of Torts* § 135 (4th ed.1971)). The linchpin of an action for battery, then, is simply "the intent to make contact." *Id.* Thus, the Mieles' cause of action against the government arose out of a battery, despite the attacker's mental incompetency.

¶ 44 Though the majority rule is not without its critics, "the fact remains that 'courts in this country almost invariably say in the broadest terms that an insane person is liable for his torts.'" *Delahanty*, 799 F.Supp. at 187 (quoting *Williams*, 775 P.2d at 673). Individuals such as Mr. Giese are included in this category of liable actors because "'mental deficiency does not relieve [them] from liability for conduct which does not conform to the standard of a reasonable man under like circumstances.'" *Polmatier*, 537 A.2d at 470 (quoting Restatement (Second) of Torts § 283B). Indeed, the Restatement provides that, for the sane but mentally deficient, "no allowance is made, and the actor is held to the standard of conduct of a reasonable man who is not mentally deficient, even though it is in fact beyond his capacity to conform to it." Restatement (Second) of Torts § 283B cmt. c.

¶ 45 Otherwise, the law would err on the side of protecting actors who voluntarily make physical contacts with other people, producing injury or offense, from liability for their deliberate action. The result would be that the victims who were subjected to a harmful or offensive physical contact are at the mercy of those who deliberately come into contact with them, and must bear the costs of the injuries inflicted thereby. The practical consequences of such an interpretation would turn the law of our civil liability on its head.

¶ 46 For example, a man who decides to flatter a woman he spots in a crowd with an unpetitioned-for kiss, one of the examples of battery Prosser provides, *Prosser, supra,* § 9, at 41–42, would find no objection under the Wagners' proposed rule so long as his intentional contact was initiated with no intent to injure or offend. He would be held civilly liable for his conduct only if he intended to harm or offend her through his kiss. A woman in such circumstances would not enjoy the presumption of the law in favor of preserving her bodily integrity; instead, her right to be free from physical contact with strangers would depend upon whether she could prove that the stranger hoped to harm or offend her through his contact. So long as he could show that he meant only flattery and the communication of positive feelings towards her in stroking her, kissing her, or hugging her, she must be subjected to it and will find no protection for her bodily integrity in our civil law.

¶ 47 The law would serve to insulate perpetrators of deliberate contact from the consequences their contact inflicts upon their victims. Bodily integrity would be secondary to protecting a perpetrator's right to deliberately touch another person's body without being accountable for the consequences that contact occasioned. The "harmful or offensive" element would, in essence, be viewed from the perspective of the actor, not the objective eye of the law. Under this rule, so long as the actor does not deem his deliberate contact to be harmful or offensive, he may touch others however he wishes without liability under our law of battery. It is clear that the purpose of our civil law on battery was designed to create the opposite incentive. *See, e.g.,* Restatement (Second) of Torts § 283B cmts. b & c.

¶ 48 The objection can be raised that such a theory of liability as we posit today expands liability beyond all reasonable bounds. Perhaps a handshake or other similar gesture will now expose a person to a lawsuit for battery if he happens to unknowingly shake the hand of an unwilling individual. The Restatement, however, and Prosser's analysis thereof, yields this objection wholly without basis.

¶ 49 We must bear in mind that not all physical contacts deliberately initiated constitute batteries, only harmful or offensive ones. Though it is true that the actor need not appreciate that his contact is, nor need he intend it to be, harmful or offensive in order for it to be so and for him to be accountable for the injuries he inflicted by his intentional contact, the contact must in fact be harmful or offensive in order to constitute a battery.

¶ 50 We now explain that the legal test for harmful or offensive contact preserves the Restatement's purpose of protecting the bodily integrity of individuals from invasion while still recognizing the practical realities of our physical world and the inevitable contacts therein. Because "harmful or offensive contact" is determined objectively by the law,

only those deliberate contacts that meet the legal test for harmful or offensive will constitute batteries.

## B.  Harmful or Offensive Contact at Law

¶ 51 A harmful or offensive contact is simply one to which the recipient of the contact has not consented either directly or by implication. *Prosser, supra*, § 9, at 41–42. Under this definition, harmful or offensive contact is not limited to that which is medically injurious or perpetrated with the intent to cause some form of psychological or physical injury. Instead, it includes all physical contacts that the individual either expressly communicates are unwanted, or those contacts to which no reasonable person would consent.

¶ 52 What is not included in this definition are the uncommunicated idiosyncratic preferences of individuals not to be touched in ways considered normal and customary in our culture. Instead, the law assumes consent to contacts "according to the usages of decent society," and unless an individual expressly states that he does not want to shake hands, for example, someone who shakes his hand against his silent wishes has not committed a harmful or offensive contact. *Id.* § 9, at 42.

¶ 53 As Prosser notes in his analysis on the subject, "in a crowded world, a certain amount of personal contact is inevitable, and must be accepted. Absent expression to the contrary, consent is assumed to all those ordinary contacts which are customary and reasonably necessary to the common intercourse of life." *Id.* Among the contacts Prosser noted as part of this common intercourse were: "a tap on the shoulder," "a friendly grasp of the arm," and "a casual jostling to make a passage." *Id.* Thus, the tort of battery seeks to strike a balance between preserving the bodily integrity of others and recognizing and accommodating the realities of our physical world.

¶ 54 Because the law defines "harmful and offensive" with reference to the mores of polite society, and protects against invasions of bodily integrity perpetrated outside those bounds, whether consent is assumed also depends upon who is making the contact. For example, it seems clear that "the usages of a decent society" and "polite manners" are in nowise offended when a baby reaches out to perform the non-medically injurious act of stroking the hair of a nearby stranger. Such encounters with babies are "customary . . . in the course of life." *Id.* § 9, at 42.

¶ 55 Thus, we can include this type of contact from babies in the category of contacts for which we are assumed to have consented. A grown man, on the other hand, perpetrating the same act for equally complimentary reasons, would not enjoy the same privilege, for his behavior would not be considered by reasonable people to be a customary contact in decent society to which members consent.

¶ 56 The Wagners argue that Mr. Giese has the mental age of a small infant, and should be held no more accountable for his acts than a child of his mental age would. We disagree with the Wagners' legal conclusion.

¶ 57 As already explained, the law of torts, and battery in particular, was designed to protect people from unacceptable invasions of bodily integrity. Taking into account the realities of our physical world, and the physical contacts that are not only inevitable, but are part of our cultural customs, there are limits to the physical contacts from which the law will protect us. The law assumes consent as to all regular and culturally acceptable contacts. Certain contacts from very young children fall into this category primarily because most contacts from very young children are not medically injurious given their relative physical weakness and their standing in our society.

¶ 58 Not so with mentally handicapped adults. Even if the adult had the mental capacity of a small child, the difference in size and strength would make any attempt at an analogy between societal consent to a baby's contact and societal consent to attacks at the hand of such an adult wholly unreasonable. Clearly, society has not simply consented to violent contacts from the mentally handicapped. Under the Restatement, as long as a person, mentally handicapped or not, intended to touch the person of another, and the touch was a harmful or offensive one

at law, he has committed a battery, and the price of the injuries he inflicted must be paid out of his, or his caretaker's, pockets.

¶ 59 Further, aside from this practical difference, there is a legal one as well. While the Restatement does provide that "[i]f an actor is a child, his mental deficiency is taken into account," Restatement (Second) of Torts § 283B cmt. a, it grants no such exception for adults with the mental age of a child, instead clearly refusing to provide any allowance for the mentally handicapped to be free from liability for deliberate contacts that produce harm or offense. *Id.* § 283B cmt. c.

¶ 60 It does not matter that Mr. Giese may not have understood that Mrs. Wagner had not consented to the contact because it is not an element of the tort that the actor appreciate that the contact is unwanted. His mental incompetence may insulate him from criminal liability because the mental handicap may negate the mens rea requirement, but the same level of intent is not required for civil liability to attach.

¶ 61 The Wagners argue that Mr. Giese could not have committed any tort at all, either sounding in intentional torts or in negligence. However, if we were to adopt the rule urged by the Wagners, we would be contorting the law in order to provide recovery in this isolated instance. Yet, in doing so, we would be contracting the recoveries of all other plaintiffs victimized by insane or mentally handicapped individuals who are suing a non-State entity, and, in the process, limiting the protection of the bodily integrity of everyone.

¶ 62 The policy behind the Restatement definition of battery is to allow plaintiffs to recover from individuals who have caused them legal harm or injury, and to lay at the feet of the perpetrators the expense of their own conduct. Lawmakers have specifically declined to exempt mentally handicapped or insane individuals from the list of possible perpetrators of this tort for the express reason that they would prefer that the caretakers of such individuals feel heightened responsibility to ensure that their charges do not attack or otherwise injure members of the public.

¶ 63 We recognize that, in this instance, the retained immunity doctrine bars the caretakers of such a handicapped person from taking responsibility for the conduct of their charge. It is unfortunate, and perhaps it is improvident of the State to retain immunity in this area. But it is not our role as a judiciary to override the legislature in this matter; it is for us only to interpret and apply the law as it is. We will not limit the recoveries of all other plaintiffs similarly injured by defining the tort of battery in such a way as to make it far more burdensome for plaintiffs to satisfy its elements and recover, nor will we distort the plain language of the Restatement so as to elevate an actor's "right" to deliberately touch others at will over an individual's right to the preservation of her bodily integrity.

## CONCLUSION

¶ 64 Applying the rule we have laid out today to the facts of this case, it is clear that Mr. Giese's attack constituted a battery upon Mrs. Wagner. There is no allegation that his action was the result of an involuntary muscular movement or spasm. Further, the Wagners concede that Mr. Giese affirmatively attacked her; they do not argue that he made muscular movements that inadvertently or accidentally brought him into contact with her.

¶ 65 The fact that the Wagners allege that Mr. Giese could not have intended to harm her, or understood that his attack would inflict injury or offense, is not relevant to the analysis of whether a battery occurred. So long as he intended to make that contact, and so long as that contact was one to which Mrs. Wagner had not given her consent, either expressly or by implication, he committed a battery. Because battery is a tort for which the State has retained immunity, we affirm the court of appeals' decision to dismiss the case for failure to state a claim.

¶ 66 Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice WILKINS' opinion.

DURHAM, Chief Justice, concurring:

¶ 67 I concur in the lead opinion's excellent treatment of the battery issue and write separately merely to note that the petitioners' arguments regarding the continuing validity of *Ledfors v. Emery County School District*, 849 P.2d 1162 (Utah 1993), were stricken by this court because they were not addressed by the court of appeals and thus were not within the scope of our review on certiorari. Our opinion here therefore does not address that issue. *Cf. Doe Parents No. 1 v. State*, 100 Hawai'i 34, 58 P.3d 545 (2002).