2010 UT App 185

**STATE of Utah, Plaintiff and Appellee,**

v.

**Roger Howard STEELE, Defendant and Appellant.**

**No. 20090417–CA.**

Court of Appeals of Utah.

July 9, 2010.

Gary W. Pendleton, St. George, for Appellant.

Mark L. Shurtleff and Christine F. Soltis, Salt Lake City, for Appellee.

Before Judges DAVIS, McHUGH, and ROTH.

## OPINION

ROTH, Judge:

¶ 1 Defendant Roger Howard Steele appeals his conviction for wanton destruction of protected wildlife, a third degree felony, *see*

Utah Code Ann. § 23–20–4(1), (3)(a)(ii) (2003),[1] for taking[2] a trophy animal without a valid hunting permit. Defendant challenges the trial court's conclusion that his hunting permit was void as well as the court's decision to give a mistake of law jury instruction and further alleges that his right to a speedy trial was violated.[3] We affirm.

## BACKGROUND

¶2 In 2003, the Division of Wildlife Resources (the Division) offered a drawing for Cooperative Wildlife Management Unit (CWMU) hunting permits for a special week-long all-expenses-paid trophy hunt on private land: the "Once–in–a–Lifetime Hunt." The CWMU program gives private landowners throughout Utah the incentive to manage wildlife on their properties while giving hunters a unique opportunity to hunt on private lands where they are more likely to harvest mature trophy animals. Each year, the Division gives ninety percent of the CWMU hunting permits that are available for each unit to the landowner for distribution as he or she sees fit; the Division then distributes the remaining ten percent by public drawing. The public drawing for these few CWMU hunting permits is available only to Utah residents. Nonresidents—or residents who either did not participate or were unsuccessful in the public drawing—must purchase a CWMU hunting permit directly from the landowner in order to participate in the hunt. In 2003, only six CWMU hunting permits were available to Utah residents by public drawing for the Alton unit—the unit for which the hunting permit here was issued. Those awarded CWMU hunting permits through the public drawing received lodging, meals, and a guide for up to a week at no expense. The remaining CWMU hunting permits were available only from the landowner at a cost of $12,000 each. Defendant, a California resident with Utah roots, entered the public drawing for Utah residents and was awarded a CWMU hunting permit.[4] Defendant participated in the "Once–in–a–Lifetime Hunt" and used his hunting permit to take a coveted trophy male mule deer.

¶3 Utah hunting permits are typically distributed through a lottery-style drawing. Applicants who are not selected receive points that can be accumulated and then used in future drawings to increase their chances of selection. Defendant frequently applied for hunting permits in Utah. Over the years, Defendant accumulated more points than nearly anyone else in the applicant pool, making it very likely that he would be selected to receive any hunting permit he applied for in 2003.

¶4 In years prior to 2003, Defendant applied for Utah hunting permits as a nonresident; although he grew up and graduated from high school in Utah, Defendant moved to California to attend college and continued to live there, working as an aerospace engineer. In 2001, Defendant married a Utah resident (Wife), who moved to California to reside with Defendant. After the move, Wife traveled to Utah several times a month to complete college course work. After a few months, she transferred to a California college and then graduated in 2002. Defendant and Wife would occasionally travel to Utah for a few days at a time to visit their families; during these visits, they would stay with family members, including Wife's parents. Defendant and Wife also kept horses in Utah. Defendant considered moving back to

1. Because Defendant was charged for conduct that occurred in 2003, we cite to that version of the code when citing statutes that have since been substantively amended. *See generally* Utah Code Ann. § 23–20–4 (2003) (current version at *id.* § 23–20–4 (Supp.2009)); *id.* § 23–20–3 (2003) (current version at *id.* § 23–20–3 (Supp. 2009)); *id.* § 23–19–5 (2003) (current version at *id.* § 23–19–5 (2007)). Otherwise, we cite to the current version of the code for the reader's convenience.

2. "Take" is defined as to "hunt, pursue, harass, catch, capture, possess, angle, seine, trap, or kill any protected wildlife." Utah Code Ann. § 23–13–2(43)(a) (Supp.2009).

3. The issues regarding Defendant's right to a speedy trial and the validity of his hunting permit were first decided by Judge David L. Mower. Defendant raised these issues again before Judge Marvin Bagley, who reconsidered the issues and ultimately adopted Judge Mower's rulings.

4. It is uncontested that Defendant was not a Utah resident when he applied for and used the CWMU hunting permit.

Utah and looked for employment here, but he could not find employment as an aerospace engineer of the same "caliber and quality" or at the same pay to which he was accustomed. Nonetheless, during the time at issue, Defendant did not have a Utah residence. Rather, he maintained his primary residence in California, worked in California, had a California driver license, registered and licensed his vehicles in California, filed tax returns in California, and voted in California.

¶ 5 In the course of applying for a CWMU hunting permit for the "Once–in–a–Lifetime Hunt," Defendant received a copy of the Division's Utah Big Game Proclamation (the Proclamation). *See generally* Utah Code Ann. § 23–13–2(33) (Supp.2009) (defining "Proclamation" as "the publication used to convey a statute, rule, policy, or pertinent information as it relates to wildlife"). The Proclamation set out the official residency requirements for obtaining Utah resident hunting permits as well as the statutory definitions of "resident" and "domicile": "resident" is defined as a person who "has been domiciled in the state of Utah for six consecutive months immediately preceding the purchase of a license," *id.* § 23–13–2(37)(a)(i), and "domicile" is defined as a person's "fixed permanent home," *id.* § 23–13–2(13)(a)(i).[5]

¶ 6 Defendant read the Proclamation "very carefully" several times and concluded that "[he] qualified" as a Utah resident; he then applied for the CWMU hunting permit public drawing. On the application, Defendant listed Wife's parents' Utah address as his residence and also listed their Utah phone numbers as his own. Other than the occasional weekend visit, Defendant had never lived with Wife's parents and had stayed at their house only intermittently, for a couple of days at a time. Wife's parents did not authorize Defendant to use their address or phone numbers on his application. Defendant also stated on his application that he was a Utah resident and had been a Utah resident for the preceding six months. Defendant signed the application, certifying that (1) the statements on the application were true, (2) he understood any false statement would subject him to criminal prosecution, (3) he had read and understood the Proclamation, and (4) he was eligible for the hunting permit for which he had applied. Defendant applied for the CWMU hunting permit online. Had he not used a Utah address and represented himself as a Utah resident for a period of at least six months, Defendant would not have been eligible to apply for the "Once–in–a–Lifetime" CWMU hunting permit and the online application process would not have allowed him to complete and submit an application for that permit.

¶ 7 As anticipated, due to his uniquely high accumulation of points, Defendant was selected by drawing to receive a Utah resident CWMU hunting permit for the "Once–in–a–Lifetime" hunt. In September 2003, Defendant participated in the hunt and used that hunting permit to take a coveted trophy male mule deer. In the course of a subsequent investigation, the Division discovered that Defendant was not a Utah resident.[6]

¶ 8 Defendant was charged with wanton destruction of protected wildlife, a third degree felony, in violation of Utah Code section 23–20–4 (the Unauthorized Taking Statute), which prohibits taking a trophy animal without a valid hunting permit. *See* Utah Code Ann. § 23–20–4(1), (3)(a)(ii) (2003).[7] To es-

---

5. "Domicile" is defined as the place

(i) where an individual has a fixed permanent home and principal establishment;
(ii) to which the individual if absent, intends to return; and
(iii) in which the individual, and the individual's family voluntarily reside, not for a special or temporary purpose, but with the intention of making a permanent home.

Utah Code Ann. § 23–13–2(13)(a) (Supp.2009). "To create a new domicile an individual must[ ] abandon the old domicile." *Id.* § 23–13–2(13)(b)(i).

6. During the investigation, Defendant was asked if he had been a Utah resident for six consecutive months immediately prior to his application for the CWMU hunting permit. Defendant responded that he did not know that was a requirement and stated that he guessed he did not qualify as a resident. Yet on his application, Defendant had represented that he had been a Utah resident for precisely six months.

7. The Unauthorized Taking Statute reads,

(1) A person is guilty of wanton destruction of protected wildlife if that person:

tablish that Defendant had taken a trophy animal without a valid hunting permit, the State relied upon Utah Code section 23–19–5 (the Unlawful Permit Statute), which makes it unlawful for a nonresident to purchase a resident hunting permit or for any person to obtain a hunting permit by fraud, deceit, or misrepresentation. *See id.* § 23–19–5. The State argued that because Defendant had obtained a hunting permit in violation of the Unlawful Permit Statute, his hunting permit was void. In response, Defendant argued that his hunting permit was merely voidable and could be used legitimately until suspended or revoked. The trial court agreed with the State and concluded that Defendant's hunting permit, having been obtained in violation of the Unlawful Permit Statute, "was invalid and could not be lawfully used for hunting wildlife."

¶ 9 As a further defense to the charge that he had taken a trophy animal without a valid hunting permit, Defendant asserted that he did not have the requisite culpable mental state because he believed in good faith that he qualified as a Utah resident when he applied for his hunting permit. Defendant said that he based this belief on his reading of the Proclamation's official residency requirements and his application of those requirements to the circumstances of his and Wife's living arrangements. The State responded by requesting a mistake of law jury instruction, requiring that Defendant's reliance on the Proclamation be reasonable. The trial court gave this instruction over Defendant's objection that it unfairly undermined his good faith defense.

¶ 10 Defendant also moved to dismiss, alleging that his right to a speedy trial had

been violated. Defendant was first charged by information in December 2003. The case was dismissed in January 2007 then refiled in March 2007.[8] The reason for the dismissal was that two of Defendant's former attorneys had accepted positions as prosecutors with the Kane County Attorney's Office—the county that was prosecuting Defendant. After Defendant's second attorney withdrew, the State dismissed the case so that a conflict-free special prosecutor from another county could be appointed and make an independent decision whether to refile. A prosecutor from Iron County was specially appointed and refiled the same charge within two months of the dismissal. In alleging that his right to a speedy trial had been violated, Defendant sought to have the three-year time period between the first filing and the dismissal as well as the two-month time period between the dismissal and the refiling included in the speedy trial calculation, alleging that the State did not have a legitimate reason for dismissing then refiling the charge. The trial court denied Defendant's motion, reasoning that the "delay [was] associated with numerous continuances due to arising conflicts of interest .... [and] to ensure that ... Defendant received a fair trial."

¶ 11 In February 2009, Defendant was tried before a jury, which found him guilty of taking a trophy animal without a valid hunting permit. Defendant appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 12 Defendant challenges the trial court's interpretation of the Unlawful Permit Statute that hunting permits obtained in violation of that section are void rather than

---

(a) commits an act in violation of ... Subsection 23–20–3(1) [for the unauthorized taking of protected wildlife or possession of protected wildlife without a valid hunting permit];
(b) captures, injures, or destroys protected wildlife; and
(c)(i) does so with intentional, knowing, or reckless conduct
....

Utah Code Ann. § 23–20–4(1) (2003); *see also id.* § 23–20–3(1) ("Except as provided in this title or a rule, proclamation, or order of the Wildlife Board, a person may not: (a) take ... protected wildlife ... [or] (d) possess protected

wildlife ... unaccompanied by a valid license, permit, tag, certificate of registration, bill of sale, or invoice."); *id.* § 23–20–4(3)(a)(ii) ("Wanton destruction of protected wildlife is ... a third degree felony if ... a trophy animal was ... destroyed[.]").

8. In addition to the felony charge, Defendant was also originally charged with several other misdemeanors. The trial court, however, dismissed the misdemeanor charges following the March 2007 refiling, concluding that they were barred by the statute of limitations.

voidable. Issues involving interpretation of statutes and common law are questions of law, reviewed for correctness. *See Daniels v. Gamma W. Brachytherapy, LLC,* 2009 UT 66, ¶ 46, 221 P.3d 256.

¶ 13 Defendant also challenges the trial court's decision to give a mistake of law jury instruction in response to his defense that he believed in good faith that he qualified as a Utah resident. "Because jury instructions are statements of law, we review challenges to jury instructions under a correctness standard." *State v. Powell,* 2007 UT 9, ¶ 11, 154 P.3d 788 (internal quotation marks omitted); *see also Cheves v. Williams,* 1999 UT 86, ¶ 37, 993 P.2d 191 ("Whether a trial court properly instructed the jury is a question of law, which we review for correctness." (internal quotation marks omitted)).

¶ 14 Defendant finally alleges that his right to a speedy trial was violated. *See generally* Utah Const. art. I, § 12 ("In criminal prosecutions the accused shall have the right ... to have a speedy ... trial...."); Utah Code Ann. § 77–1–6(1)(f) (2008) ("In all criminal prosecutions the defendant is entitled[ ] ... [t]o a speedy ... trial....").[9] Whether a defendant's right to a speedy trial has been violated presents a question of law, which we review for correctness. *See State v. Mejia,* 2007 UT App 337, ¶ 8, 172 P.3d 315 (stating on review of a speedy trial claim that "[c]onstitutional issues, including questions regarding due process, are questions of law that we review for correctness" (internal quotation marks omitted)).

## ANALYSIS

### I. The Unlawful Permit Statute

¶ 15 Defendant asserts that the trial court erred in concluding that hunting permits obtained in violation of the Unlawful Permit Statute are void. Rather, Defendant argues that hunting permits obtained in violation of that statute are voidable and can be

used legitimately until suspended or revoked. Because the Division had not suspended or revoked his hunting permit before he used it to take the trophy animal, Defendant argues that his hunting permit was valid and he cannot be prosecuted for its use under the Unauthorized Taking Statute. Defendant's argument requires that we interpret the Unlawful Permit Statute.

¶ 16 In interpreting a statute, "our primary goal ... is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the statute was meant to achieve." *State v. Burns,* 2000 UT 56, ¶ 25, 4 P.3d 795. "When examining the statutory language we assume the legislature used each term advisedly and in accordance with its ordinary meaning." *State v. Jeffries,* 2009 UT 57, ¶ 7, 217 P.3d 265 (internal quotation marks omitted). We, therefore, "first look[ ] to the statute's plain language," *Wagner v. State,* 2005 UT 54, ¶ 10, 122 P.3d 599 (alteration in original) (internal quotation marks omitted), and only "look beyond the plain language ... if we find some ambiguity," *Burns,* 2000 UT 56, ¶ 25, 4 P.3d 795. Further, we avoid interpreting a statute in a way that creates an absurd or unreasonable result. *See Jeffries,* 2009 UT 57, ¶ 8, 217 P.3d 265.

¶ 17 In 2003, when Defendant was charged with wanton destruction of protected wildlife, the Unlawful Permit Statute stated in its entirety,

It is unlawful for any person to obtain or attempt to obtain a license, permit, tag, or certificate of registration by fraud, deceit, or misrepresentation. It is unlawful for a nonresident to purchase a resident license. It is unlawful for a resident to purchase a nonresident license. Any person violating provisions of this section is guilty of a class B misdemeanor.

Utah Code Ann. § 23–19–5 (2003). At that time, the Unlawful Permit Statute did not

9. Defendant has raised his speedy trial argument exclusively under the Utah Constitution. "The standard for evaluating whether a defendant's right to a speedy trial was violated under the Utah Constitution is similar to the federal standard." *State v. Trafny,* 799 P.2d 704, 708 (Utah 1990) (interpreting the speedy trial requirements under the Utah Constitution and Utah Code section 77–1–6(1)(f) consistently with the federal constitution's speedy trial requirements (citing *State v. Banner,* 717 P.2d 1325, 1328 n. 3 (Utah 1986) ("The speedy trial right reserved under the Utah Constitution is no greater or lesser than its federal counterpart."))).

specify whether a hunting permit obtained in violation of its terms was void or merely voidable. Defendant argues that in the absence of such a specific statement, we must apply the common law principle that legal interests obtained by fraud or misrepresentation are voidable rather than void. Defendant further argues that his interpretation of the Unlawful Permit Statute is supported by a 2007 amendment to that statute that specifically declared invalid any permit obtained in violation of its terms. We conclude that a hunting permit obtained in violation of the 2003 version of the Unlawful Permit Statute was void.

¶ 18 "The distinction between void and voidable is important, although the terms are not always used precisely." *Ockey v. Lehmer*, 2008 UT 37, ¶ 18, 189 P.3d 51. "A [legal interest] that is void cannot be ratified or accepted...." *Id.* "In contrast, a [legal interest] that is voidable may be ratified at the election of the injured party[, and o]nce ratified, the voidable [legal interest] is deemed valid." *Id.*

¶ 19 A legal interest is void if it is illegal, "offend[s] public policy[,] or harm[s] the public." *Id.* ¶ 19; *see also id.* ¶ 18 n. 7 (stating that a legal interest "is void which is done against law at the very time of doing it, and where no person is bound by the act" (internal quotation marks omitted)); *Millard County Sch. Dist. v. State Bank of Millard County*, 80 Utah 170, 14 P.2d 967, 972 (1932) (stating that legal interests "that are malum in se or malum prohibitum, which contravene some rule of public policy [or] violate some public duty ... are illegal and void"); *Hatch v. Lucky Bill Mining Co.*, 25 Utah 405, 71 P. 865, 866 (1903) (indicating that a legal interest is void if it arises out of actions that are "criminal, opposed to good morals, [ ]or against public policy"). Legal interests "that offend an individual, such as those arising from fraud, misrepresentation, or mistake, are voidable." *Ockey*, 2008 UT 37, ¶ 19, 189 P.3d 51. Thus, although Defendant correctly states the law—that legal interests obtained by fraud or misrepresentation are generally considered voidable—his argument fails to consider the illegality of his conduct, and legal interests obtained in violation of the law

are against public policy and are, therefore, void. *See id.* ¶¶ 18–19, 22–23.

¶ 20 Here, Defendant's conduct was illegal and against public policy. The Unlawful Permit Statute clearly states that it is "*unlawful* for any person to obtain ... [a hunting] permit ... by fraud, deceit, or misrepresentation." Utah Code Ann. § 23–19–5 (emphasis added). *See generally Ockey*, 2008 UT 37, ¶ 23, 189 P.3d 51 (explaining *Zion's Serv. Corp. v. Danielson*, 12 Utah 2d 369, 366 P.2d 982, 985–86 (1961), where a contract was determined void because its purpose had been "declared unlawful" (internal quotation marks omitted)). The Unlawful Permit Statute also makes it "*unlawful* for a nonresident to purchase a resident" hunting permit. Utah Code Ann. § 23–19–5 (emphasis added). Whether fraudulent or not, Defendant's conduct in obtaining a resident hunting permit was illegal, and there is no more clear statement that an act is against public policy than to make it criminal. *See generally Fox v. MCI Commc'n Corp.*, 931 P.2d 857, 860 (Utah 1997) ("Most criminal statutory prohibitions provide narrow and clear-cut definitions of a specific public policy ...." (internal quotation marks omitted)); *see also* Utah Code Ann. § 23–19–5 (specifying that violations of this section constitute a class B misdemeanor).

¶ 21 Defendant's interpretation of the Unlawful Permit Statute conflicts with the intent and purpose of that section and its related provisions. Utah's wildlife protection statutes are designed to protect Utah's wildlife by regulating when and how wildlife may be lawfully killed: requiring a hunter to lawfully obtain a hunting permit promotes this policy; allowing a hunter to benefit from an illegally obtained hunting permit circumvents this policy. Adopting Defendant's argument would make it so illegally obtaining a hunting permit would be punishable but *using* an illegally obtained hunting permit would not, unless the illegality was discovered and the hunting permit was suspended or revoked before its use. To interpret the Unlawful Permit Statute to allow a hunter to benefit from an illegally obtained hunting permit would contravene the intent and purpose of the statute and its surrounding provisions.

¶ 22 In addition, it is clear that a number of other related public policy concerns underlie the Unlawful Permit Statute, including providing the public with hunting opportunities on a rational and regulated basis that appropriately distinguishes between residents and nonresidents regarding fees and access to Utah hunting privileges.

> Most criminal statutory prohibitions provide narrow and clear-cut definitions of a specific public policy designed to protect both society at large and specific individuals from antisocial acts. The law ought not to allow those prohibitions to be circumvented by ... [persons] who seek to secure an objective prohibited by the criminal law....

*Fox*, 931 P.2d at 860 (internal quotation marks omitted). To accept Defendant's argument that a hunting permit obtained in violation of the law was simply voidable would allow a person "to secure an objective prohibited by the criminal law," *see id.* (internal quotation marks omitted), and reap the fruits of that illegal conduct simply because the Division had not caught up with him before he fully accomplished the unlawful purpose. Interpreting the Unlawful Permit Statute to allow such a result would produce the kind of absurd and unreasonable result that our rules of statutory construction caution us to avoid. *See State v. Jeffries*, 2009 UT 57, ¶ 8, 217 P.3d 265. Neither the language of the statute nor the principles of the common law require such an outcome.

¶ 23 Defendant's argument that the 2007 amendment requires that the prior law be interpreted differently is unavailing. In 2007, the Unlawful Permit Statute was amended to provide that "[a]ny license, permit, tag, or certificate of registration obtained in violation of [this section] is invalid." Utah Code Ann. § 23–19–5(2) (2007). The amendment's sponsor stated that its purpose was to close a purported "loophole" that allowed a hunting permit obtained in violation

of the Unlawful Permit Statute to nonetheless remain valid until suspended or revoked. Recording of Utah House Floor Debates, 57th Leg., Gen. Sess. (Jan. 18, 2007) (statement of Rep. Wheeler on H.B. 48). Defendant presents the 2007 amendment, along with the sponsor's comments, as evidence that hunting permits obtained in violation of the Unlawful Permit Statute were originally voidable.

¶ 24 It is unnecessary to reach Defendant's legislative history argument because the statute's plain language is dispositive. *See generally State v. Alfatlawi*, 2006 UT App 511, ¶ 40, 153 P.3d 804 ("[W]here the statutory language is plain and unambiguous, we do not look beyond the language's plain meaning to divine legislative intent." (alteration in original)).[10] The Unlawful Permit Statute clearly states that it is "unlawful" to violate that section and such a violation is a class B misdemeanor. *See* Utah Code Ann. § 23–19–5 (2003). As discussed above, legal interests that are unlawfully obtained are void. *See Ockey v. Lehmer*, 2008 UT 37, ¶¶ 18 n. 7, 19, 23, 189 P.3d 51 (explaining *Zion's Serv. Corp.*, 366 P.2d at 985–86, where a contract was determined void because its purpose had been "declared unlawful" by the legislature (internal quotation marks omitted)); *see also* Utah Code Ann. § 68–3–1 (2009) ("The common law ... so far as it [i]s not repugnant to, or in conflict with ... [the] laws of this state ... is hereby adopted, and shall be the rule of decision in all courts of this state."); *Wagner v. State*, 2005 UT 54, ¶¶ 13–15, 122 P.3d 599 (using common law principles to interpret a statutory term). Because the plain and ordinary meaning of the language used in the Unlawful Permit Statute indicates that hunting permits obtained in violation of that section are void, we do not reach Defendant's legislative history argument.

¶ 25 We therefore conclude that Defendant's hunting permit is void and was invalid at the time of its use because it was illegally

---

**10.** Although the sponsor of the 2007 amendment made a comment that seems to indicate that he interpreted the prior version of the statute as Defendant would have us do here, no source is identified for that interpretation. Defendant has not directed us to any portion of the legislative record of either the original enactment or of the

subsequent amendment that contains any legal authority or analysis actually interpreting the Unlawful Permit Statute in this way. In any event, "the comments of a single legislator [are] not necessarily control[ling]" when interpreting a statute. *See State v. Alfatlawi*, 2006 UT App 511, ¶ 41, 153 P.3d 804.

obtained in violation of the Unlawful Permit Statute.

## II. The Mistake of Law Jury Instruction

 ¶ 26 Defendant next argues that the trial court erroneously gave a mistake of law jury instruction in response to his defense that he had believed in good faith that he qualified as a Utah resident when applying for his hunting permit. The instruction given by the court tracked the language of Utah Code section 76–2–304(2) (the Mistake of Law Statute) and instructed the jury that ignorance or mistake of law "is no defense to a crime unless ... [Defendant] reasonably believed his conduct did not constitute an offense ... [due to his] reasonable reliance upon [a]n official statement of the law ... by an administrative agency charged by law with responsibility for interpreting the law in question." Utah Code Ann. § 76–2–304(2) (2008).

¶ 27 Under the facts of this case, to be guilty of violating the Unauthorized Taking Statute, Defendant must have intentionally, knowingly, or recklessly used an invalid hunting permit to take a trophy animal. *See* Utah Code Ann. § 23–20–4(1) (2003). To prove this, the State relied upon the Unlawful Permit Statute to show that Defendant had obtained his hunting permit by fraud, deceit, or misrepresentation. *See generally id.* § 23–19–5. The State's theory of the case was that if Defendant had obtained his hunting permit by fraud, deceit, or misrepresentation, then he had intentionally, knowingly, or recklessly used an invalid hunting permit to take a trophy animal. The trial court, however, instructed the jury that "[D]efendant was entitled to rely upon the authority of [his hunting] permit unless he fraudulently obtained the permit by *intentionally* misrepresenting himself to be a Utah resident." (Emphasis added.) Although the State contested what it considered to be the unduly high mens rea set by this instruction, that is not an issue raised on appeal.[11]

¶ 28 In his defense, Defendant asserted that he lacked the culpable mental state to have intentionally misrepresented his residency when he applied for his hunting permit because he believed in good faith that he qualified as a Utah resident. In response, the State argued that it was entitled to a mistake of law jury instruction because Defendant had concluded that he qualified as a resident by relying on the Proclamation— "[a]n official statement of the law ... by an administrative agency charged by law with responsibility for interpreting the law in question," Utah Code Ann. § 76–2–304(2); *see also* Utah Code Ann. § 23–13–2(33) (Supp.2009) (defining the "Proclamation"). The State reasoned that this defense fell within the scope of the Mistake of Law Statute and ought to be subject to the statutory requirement of reasonableness. The trial court agreed and gave the mistake of law jury instruction over Defendant's objection.

¶ 29 Defendant argues that the trial court erred in giving the mistake of law jury instruction because, in the context of the intentional misrepresentation mental state requirement, it made an unreasonable belief equivalent to an intentional misrepresentation, in effect telling the jury to disregard his good faith defense. According to Defendant, the reasonableness requirement therefore unfairly undermined his defense that he had concluded in good faith that he qualified as a Utah resident and lacked the specific intent to intentionally misrepresent his residency, even if his belief was objectively unreasonable. In other words, Defendant was not raising a mistake of law as an affirmative defense—i.e., he was not asserting that his mistake of law justified his conclusion that he qualified as a resident. Rather, his defense was that he believed in good faith that he was a Utah resident and therefore did not intentionally misrepresent his residency; he thus lacked the specific intent mental state that was required for conviction.

---

11. The State expressed the view that by requiring intentional misrepresentation as the sole acceptable mens rea and not also allowing knowing or reckless misrepresentation as alternatives, this jury instruction set an unnecessarily high bar for the mental state required for conviction. Be- cause neither party has raised this issue on appeal, we accept the mens rea required by this jury instruction for purposes of our analysis without deciding whether it correctly states the mental state required by the statutory scheme under the facts of this case.

¶ 30 It has long been recognized that "ignorance or mistake of law provides no defense or excuse for a crime .... [, and] a good faith or mistaken belief that one's conduct is legal does not relieve a person of criminal liability for engaging in proscribed conduct." 21 Am.Jur.2d *Criminal Law* § 137 (2008) (footnotes omitted). In adopting the Mistake of Law Statute, the Utah Legislature created a narrow exception to this general principal that is applicable only where the mistake arises from a reasonable reliance on an official written statement of the law. *See* Utah Code Ann. § 76–2–304(2) (setting forth specific requirements for establishing mistake of law as an affirmative defense). *See generally* 21 Am.Jur.2d *Criminal Law* § 138 (recognizing reasonable reliance on official statement of the law exception); 1 Charles E. Torcia, *Wharton's Criminal Law* § 79, at 569 (15th ed.1993) (same); *Model Penal Code* § 2.04(3)(b) (same).

¶ 31 Another exception to the general prohibition on a mistake of law defense is that "[a] mistake of law may be a defense where the mistake negates a specific intent required for the crime in question." 21 Am.Jur.2d *Criminal Law* § 137; *see also* 1 Charles E. Torcia, *Wharton's Criminal Law* § 79, at 568 (15th ed. 1993) ("[A] person who engages in penally prohibited conduct may be relieved of criminal liability therefor if, because of igno-

rance or mistake of law, he did not entertain the culpable mental state required for commission of the offense."); *Model Penal Code* § 2.04(1) (stating that ignorance or mistake of law is a defense if it negates "the purpose, knowledge, belief, recklessness or negligence required to establish a material element of the offense"). While the term "good faith" has been applied to such a defense, the issue of whether the claimed mistake of law must be a reasonable one to qualify as a legitimate defense has not been uniformly resolved by courts that have considered it.[12]

¶ 32 Although we acknowledge that the Mistake of Law Statute indicates a legislative intent that a mistake of law defense must be based upon a reasonable reliance on official statements of the law, we also recognize that a good faith belief, although objectively unreasonable, could arguably negate a specific intent. Whether the legislature intended the Mistake of Law Statute to define the exclusive exception to the general prohibition on the mistake of law defense or whether there remains room for a specific intent exception—with or without a reasonableness constraint—is an issue that is raised by the circumstances of this case but that the parties have not addressed. The parties here have not cited any legal authority on the subject, nor have they defined or analyzed the issues with the care necessary to help us resolve a potentially complex issue of first

12. A review of a few such cases shows that courts have taken varied approaches in applying the mistake of law defense to specific intent crimes. *See generally Cheek v. United States*, 498 U.S. 192, 199–203, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (concluding that the defendant's objectively unreasonable but sincerely held good faith belief could negate the willful mental state required for tax evasion); *United States v. Buehler*, 793 F.Supp. 971, 974–75 (E.D.Wash.1992) (concluding that the defendant's mistake of law would have been a viable defense to the specific intent crime with which he was charged, except that the defendant's belief was not objectively reasonable), *aff'd*, 8 F.3d 31 (9th Cir.1993); *People v. Vineberg*, 125 Cal.App.3d 127, 177 Cal. Rptr. 819, 824 (1981) (indicating that a mistake of law is a defense to specific intent crimes only "if the evidence supports a reasonable inference that any such claimed belief was held in good faith" and recognizing that "circumstances in a particular case might indicate that although defendant may have 'believed' he acted lawfully, he was aware of contrary facts which rendered such

a belief wholly unreasonable, and hence in bad faith"); *Michael Motors, Inc. v. Colorado Dealer Licensing Bd.*, 200 Colo. 455, 616 P.2d 110, 112–13 (1980) (en banc) (concluding that the defendant's mistake of law was no defense to specific intent crime of intentional failure to perform a written agreement); *Long v. State*, 44 Del. 262, 65 A.2d 489, 497 (1949) (recognizing that an honest mistake of law constitutes a defense if it negates the specific intent required for a crime and concluding that mistake of law may be a defense if a defendant erroneously concludes in good faith that the particular conduct is not prohibited by criminal law by making an effort to ascertain and abide by the law and acts in good faith reliance upon the results of such effort); *People v. Marrero*, 69 N.Y.2d 382, 515 N.Y.S.2d 212, 507 N.E.2d 1068, 1069 (1987) (discussing the applicability of a mistake of law defense and recognizing that "a good-faith belief in the legality of the conduct would negate an express and necessary element of the crime"—specific intent).

impression such as this. We ultimately decline to address Defendant's argument, however, not because it is inadequately briefed, but because even if the mistake of law jury instruction was given in error, the error in this instance was harmless.

¶ 33 "[T]o reverse a trial verdict [due to an erroneous jury instruction], this court must find not a mere possibility, but a reasonable likelihood that the error affected the result." *Cheves v. Williams*, 1999 UT 86, ¶ 20, 993 P.2d 191 (internal quotation marks omitted). *See generally State v. Verde*, 770 P.2d 116, 120 (Utah 1989) (stating that harmless errors are "errors which, although properly preserved below and presented on appeal, are sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings"); *State v. Knight*, 734 P.2d 913, 920 (Utah 1987) (concluding that the term "reasonable likelihood" is "substantively identical" to the term "reasonable probability," and requires a "probability sufficient to undermine confidence in the outcome" (internal quotation marks omitted)). "[W]e will not reverse a jury verdict where there is sufficient evidence in the record to support the jury's verdict on legally sound grounds...." *Cheves*, 1999 UT 86, ¶ 20, 993 P.2d 191.

¶ 34 In his defense, Defendant argued that he believed in good faith that he qualified as a Utah resident. Defendant based this belief on his "very careful[ ]" reading of the Proclamation's residency requirements: "resident" is defined as a person who "has been domiciled in the state of Utah for six consecutive months immediately preceding the purchase of a license," Utah Code Ann. § 23–13–2(37)(a)(i) (Supp.2009); "domicile" is defined as a person's "fixed permanent home," *id.* § 23–13–2(13)(a)(i). Based on his reading of the Proclamation's residency requirements, Defendant claims he concluded that "[he] qualified" as a Utah resident due to (1) his 2001 marriage to Wife, who had been a Utah resident until she moved to California to live with Defendant; (2) Wife's frequent presence in Utah during the months immediately following their marriage, until she transferred to a California college and graduated in 2002;

(3) his and Wife's visits to family in Utah, which were intermittent and only for a couple of days at a time; (4) his keeping of horses in Utah; (5) his searching for work in Utah; and (6) his intention to move from California to Utah at some unspecified future time. Defendant, however, did not have a Utah residence but maintained his primary residence in California where he lived, worked, was licensed to drive, registered his vehicles, filed tax returns, and voted. None of Defendant's contacts with the state of Utah come close to the specific requirement for residency set out in the Proclamation, on which he claims he relied: "six consecutive months [of domicile] immediately preceding the purchase of" a hunting permit, *id.* § 23–13–2(37)(a)(i).

¶ 35 Nonetheless, on his hunting permit application, Defendant affirmatively represented himself as a Utah resident and represented that he had been a Utah resident for a period of exactly six months. More importantly, when the application asked specifically for his address and telephone numbers, Defendant supplied a Utah address and two Utah phone numbers that were not his but Wife's parents'. Defendant used this information without Wife's parents' knowledge or consent. Defendant represented the address and telephone numbers as his own despite the fact that he had only stayed at Wife's parents' house intermittently for a couple of days at a time during his relationship with Wife. Defendant then signed his application, certifying that (1) the statements on the application were true, (2) he understood any false statement would subject him to criminal prosecution, (3) he had read and understood the Proclamation, and (4) he was eligible for the hunting permit for which he had applied.

¶ 36 Had Defendant not used a Utah address as his residence and represented himself as a Utah resident for a period of at least six months, he would not have been eligible to apply for the "Once–in–a–Lifetime" CWMU hunting permit, and he could not have completed and submitted the application form for a CWMU hunting permit. Whatever Defendant may have previously concluded about his qualifications as a Utah resident, as he filled out his application he

came to a point where he would have had to abandon his quest for a CWMU hunting permit if he had responded with candor to the questions about his actual residency. When he made the choice to use Wife's parents' Utah address rather than to list his own California address, he crossed a visible line between good faith belief and intentional misrepresentation. Further, given Defendant's uniquely high accumulation of points and his use of those points to gain a coveted CWMU hunting permit for a special all-expenses-paid "Once–in–a–Lifetime" hunt—which would have cost him $12,000 to participate in as a nonresident—Defendant had a notably strong motivation to misrepresent his residency.[13]

¶ 37 Based on these facts, we conclude that it is improbable that the jury would have determined that Defendant's asserted belief that he qualified as a Utah resident was held in good faith and that his misrepresentation was unintentional. As a result, we decline to set aside the jury's verdict because there is not a reasonable likelihood that any error that may have arisen from the mistake of law jury instruction affected the result.

### III. Due Process and Speedy Trial

¶ 38 Defendant finally contends that his right to a speedy trial was violated by the five-year delay before his trial. Defendant calculates this five-year time period by including the three years between the first filing in December 2003 until the dismissal in January 2007; the two months between the dismissal in January 2007 until the refiling in March 2007; and the two years between the refiling in March 2007 until the trial in February 2009.

¶ 39 Based on the arguments presented to the trial court and on appeal, Defendant's assertion that his right to a speedy trial was violated seems to raise two separate issues: first, whether his due process rights were violated by the State dismissing and refiling the charge against him in bad faith; and second, whether his right to a speedy trial was violated by the time that passed from the first filing in December 2003 until the trial in February 2009. A subsidiary question related to the speedy trial issue is whether the time period considered in analyzing Defendant's speedy trial claim must include the three years from the first filing in December 2003 until the dismissal in January 2007.[14] We address each of these issues in turn.

### A. Due Process

¶ 40 The intervening time between the State's good faith dismissal and subsequent refiling of charges does not implicate a defendant's right to a speedy trial. See United States v. MacDonald, 456 U.S. 1, 6–7, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982) ("[T]he Speedy Trial Clause has no application after the [State], acting in good faith, formally drops charges." (relying on United States v. Marion, 404 U.S. 307, 313, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (holding that the right to a speedy trial does not apply to the period before a defendant is formally charged))); see also State v. Hales, 2007 UT 14, ¶ 42, 152 P.3d 321 ("The ... right to a speedy trial ... does not apply in cases ... where prosecutorial delay occurs before there is a formal indictment, information, or

13. Defendant has also argued that his use of his California driver license number on his hunting permit application indicates that he lacked the specific intent to intentionally misrepresent his residency. Given the overwhelming evidence to the contrary, this alone is not enough to undermine our confidence in the verdict.

14. Specifically, Defendant argues that "the delay in bringing [him] to trial must be calculated by including all the time that has transpired since [the first filing] ... in 2003 unless the State can articulate some legitimate reason for dismissing and then reinstating the charge[]." (Emphasis added.) In so arguing, Defendant appears to have conflated the due process analysis with the

speedy trial analysis by asserting that the State's alleged bad faith in dismissing and refiling charges causes the intervening time period to be included in the speedy trial analysis. Defendant cites to no legal authority in support of this position. See generally Utah R.App. P. 24(a)(9) (requiring citation to legal authority in support of a party's argument); Allen v. Friel, 2008 UT 56, ¶ 9, 194 P.3d 903 ("An appellate court is not a depository in which [a party] may dump the burden of argument and research." (alteration in original) (internal quotation marks omitted)). Accordingly, we address the due process and speedy trial issues separately.

arrest." (citing *Marion*, 404 U.S. at 320, 92 S.Ct. 455)). That is because

> [the] right to a speedy trial is ... not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial,[15] to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on a[ defendant] while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*MacDonald*, 456 U.S. at 8, 102 S.Ct. 1497. Thus, "[a]ny undue delay [in refiling] after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause." *Id.* at 7, 102 S.Ct. 1497. To establish this kind of due process violation, a defendant must show that the delay between the State's dismissal and refiling of charges was "for the purpose of gaining a tactical advantage or for other bad faith motives." *Hales*, 2007 UT 14, ¶¶ 42–49, 152 P.3d 321. The defendant must also show "actual prejudice." *Id.*

¶ 41 Defendant has failed to show a due process violation. The first filing was dismissed because of multiple conflicts of interest that arose after two of Defendant's former defense attorneys accepted positions with the State. Defendant contends that the State could have resolved these conflicts with a substitution of counsel rather than by dismissing and refiling the case. In response, the State explains that it dismissed the case so that a conflict-free special prosecutor could be appointed and make an independent decision about whether the case ought to be refiled. Under the circumstances, this appears to be an appropriately cautious way to deal with the situation and no less reasonable than a substitution of counsel. *See generally State v. McClellan*, 2009 UT 50, ¶¶ 21–23, 216 P.3d 956 (concluding that "a former defense attorney is prohibited from participating in the prosecution of his or her former client,"

and reasoning that an entire county attorney's office may be disqualified upon failure to adequately screen defendant's former defense attorney, who was newly-employed in that office). Defendant has not explained how this decision illustrates the State's bad faith or gave the State a tactical advantage, nor is it indicative of such purposes on its face.

¶ 42 Defendant has also failed to show that he suffered any actual prejudice from the two-month delay. Defendant was originally charged with several misdemeanors in addition to the felony that is the subject of this appeal. As a result of the dismissal and the refiling of the case, the trial court dismissed the misdemeanor charges, concluding that they were barred by the statute of limitations. To that extent, Defendant benefitted from the dismissal. Further, Defendant concedes that the two-month delay between the dismissal and the refiling is not a prejudicial length of time.

¶ 43 We therefore conclude that Defendant has failed to carry his burden of showing that the State acted in bad faith or for a tactical advantage in dismissing and then refiling the charges against him, and we further conclude that Defendant did not suffer any actual prejudice.

## B. Speedy Trial

¶ 44 The " 'difference between the right to [a] speedy trial and the [defendant]'s other constitutional rights is that deprivation of the right may work to the [defendant]'s advantage.... [Thus,] deprivation of the right to speedy trial does not per se prejudice the [defendant]'s ability to defend himself.' " *State v. Trafny*, 799 P.2d 704, 706 (Utah 1990) (emphasis omitted) (quoting *Barker v. Wingo*, 407 U.S. 514, 521, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). To determine whether a defendant's right to a speedy trial has been violated, courts should balance the following nonexclusive factors: the " '[l]ength of [the] delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' " *Id.* (quoting *Barker*, 407 U.S. at 530, 92 S.Ct. 2182). A lengthy

---

15. Defendant was never incarcerated in connection with this case.

delay raises the question of prejudice but does not necessarily answer it: " 'The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.' " *Id.* (quoting *Barker*, 407 U.S. at 530, 92 S.Ct. 2182).

¶ 45 Under the speedy trial analysis, we must therefore first find a "presumptively prejudicial" delay in order to "trigger" consideration of the other speedy trial factors. *See id.* (quoting *Barker*, 407 U.S. at 530, 92 S.Ct. 2182). Defendant argues that he was subject to a presumptively prejudicial five-year delay before being brought to trial. In calculating this total five-year time period, Defendant asserts that the three years from the first filing in December 2003 until the dismissal in January 2007 must be considered as part of the overall speedy trial analysis. Assuming—without deciding—that the three-year time period between the first filing and the dismissal should be considered for purposes of a speedy trial analysis, we acknowledge that a five-year delay is an inordinate amount of time to wait for trial. We decline to decide this issue, however, because it is inadequately briefed. *See generally* Utah R.App. P. 24(a) (establishing briefing requirements).

¶ 46 Defendant cites to no legal authority in support of his position that the time between the first filing and dismissal must be considered under a speedy trial analysis.[16] *See generally id.* R. 24(a)(9) (requiring citation to legal authority in support of a party's argument); *Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 ("An appellate court is not a depository in which [a party] may dump the burden of argument and research." (alteration in original) (internal quotation marks omitted)). Defendant has also failed to analyze the length and reason for each individual delay. *See generally Trafny*, 799 P.2d at 706–07 (illustrating a speedy trial analysis). Rather, his analysis amounts to little more than an assertion that the five-year delay is presumptively prejudicial. *See generally West Jordan City v. Goodman*, 2006 UT 27, ¶ 29, 135 P.3d 874 ("A brief must go beyond providing conclusory statements and fully . . . analyze . . . its legal arguments." (internal quotation marks omitted)).

¶ 47 Nor are the proceedings from the first filing part of the record before us. *See generally Allen*, 2008 UT 56, ¶ 10, 194 P.3d 903 (requiring an appellant to provide "the appellate court with the parts of the record that are central to the determination of the appeal"). In order to conduct a speedy trial analysis, we must examine the length of each delay that occurred during the pertinent time period and the reason for the delay. *See Trafny*, 799 P.2d at 706–07 (accounting for and considering the purpose of each individual delay under the speedy trial analysis). Such an analysis is not possible without the relevant case record, and without an adequate record on appeal, we "must assume the regularity of the proceedings below." *See State v. Litherland*, 2000 UT 76, ¶ 11, 12 P.3d 92 ("If an appellant fails to provide an adequate record on appeal, th[e appellate court] must assume the regularity of the proceedings below." (internal quotation marks omitted)).[17] Because Defendant has not provided the necessary record and has failed to appropriately analyze the record that is available to us, we do not reach the merits of Defendant's speedy trial issue.

## CONCLUSION

¶ 48 We conclude that Defendant's hunting permit is void and was invalid at the time of

---

**16.** "There appears to be some confusion whether the dismissal of [charges] prior to refiling for the same conduct pauses or resets the clock for purposes of [a speedy trial analysis]." *United States v. Artez*, 290 Fed.Appx. 203, 208 (10th Cir.2008).

**17.** At oral argument, Defendant asserted for the first time that once he had shown a "presumptively prejudicial" delay, the burden shifted to the State to show that his right to a speedy trial was not violated. Thus, according to Defendant, it would be the State's responsibility to include the proceedings from the first filing in the record, and the inadequate record should, therefore, be construed against the State. Defendant cites no authority to support this position. Nor has Defendant shown that he raised this issue prior to oral argument. *See* Utah R.App. P. 24(a)(5)(A) (requiring a party to show that the issue being appealed was preserved in the trial court); *State v. Marble*, 2007 UT App 82, ¶ 19, 157 P.3d 371 (declining to review on appeal an issue raised for the first time at oral argument).

its use because it was illegally obtained in violation of the Unlawful Permit Statute. We further conclude that even if the mistake of law jury instruction was given in error, that error was harmless because there is no reasonable likelihood that the jury instruction affected the result. Finally, we conclude that Defendant has failed to show a due process violation and has inadequately briefed his speedy trial claim.

¶ 49 Accordingly, we affirm.

¶ 50 WE CONCUR: JAMES Z. DAVIS, Presiding Judge and CAROLYN B. McHUGH, Associate Presiding Judge.